**Adolph KIZAS et al., Plaintiffs,**

v.

**William H. WEBSTER et al., Defendants.**

**Civ. A. No. 78–983.**

United States District Court, District of Columbia.

Feb. 15, 1980.

On Motion to Amend Judgment and Amend Complaint April 25, 1980.

---

**1138**

Philip L. Chabot, Jr., J. Cathy Lichtenberg, Duncan, Weinberg, Palmer & Miller, P. C., Washington, D. C., for plaintiffs.

Carl S. Rauh, U. S. Atty., Royce C. Lamberth, Charles F. Flynn, Asst. U. S. Attys., Washington, D. C., for defendants.

MEMORANDUM

OBERDORFER, District Judge.

I

A.

This case involves the adoption of a new system in April, 1977, for the selection of Special Agents ("SA") for the Federal Bureau of Investigation and the removal of a preference formerly accorded clerical employees for consideration for positions as Special Agents. Named plaintiffs are 48 individuals who were employed in clerical positions on or before the adoption of the New Special Agent Selection System ("NSASS"). They allege that abrogation of the preference constituted a taking from them of valuable property rights in violation of the fifth amendment. In an amended complaint, plaintiffs also allege that as an integral part of the NSASS, the FBI instituted an affirmative action program that permitted minorities and women to meet the initial requirements for qualification as SA by achieving a lower score than was required of other applicants, including clerical employees. Plaintiffs contend that implementation of NSASS constituted discrimination against them in violation of their right to equal protection as applied to the federal government through the fifth amendment. Plaintiffs seek declaratory and injunctive relief as well as money damages against defendants William H. Webster and Clarence Kelley, respectively the present and immediate past directors of the FBI, who were sued in their official and individual capacities.

On May 15, 1979, this Court certified the case as a class action. The class was defined as clerical and support employees who entered FBI service before April 19, 1977, who were interested in positions as SA's and who understood as a condition of their employment that once they had met certain minimum requirements, they would be given preferential consideration for those positions. After briefing and oral arguments on the parties' cross-motions for summary judgment, the Court issued an Order on July 5, noting its conclusion that (a) a cause of action may be directly implied under the Constitution for violations of the fifth amendment alleged in this case; and (b) plaintiffs were not precluded from pursuing their constitutional claims based upon alleged violations of equal protection. The Court requested further briefing on a number of issues, in part to consider the implication of the Supreme Court's decision in *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), decided a few days before oral argument, and to clarify the evidence with respect to the existence of an allegedly protected interest of plaintiffs and to supplement the record with respect to the immunity issue.

The Court has concluded on the basis of material facts not in dispute that plaintiffs are entitled to summary judgment and to a declaratory judgment with respect to their claim of a protected property interest; defendants are immune from damage liability in their individual capacities. The motions of both parties for summary judgment on the equal protection and Title VII claims are denied and dismissed as unnecessary for the Court to resolve.

By accompanying Order, the Court has scheduled a status conference at which the parties shall address the standards to measure plaintiffs' damages and the appropriate procedure and forum for adjudicating the damage claims in light of the limits imposed upon this Court's jurisdiction by the Tucker Act, 28 U.S.C. § 1491 (1976).

## B.

*Background*:

At the time the FBI employed plaintiffs, and for a substantial time before that, the FBI had in place a system by which a person could become a Special Agent through any one of five qualifying programs that were based on prior education and experience as: (1) an accountant; (2) a lawyer; (3) a scientist; (4) a language specialist; or (5) having accumulated three years of professional, executive, complex investigative or other specialized experience following four years of college (the so-called modified program). The Bureau regarded satisfactory service as a clerical support employee as equivalent to other specialized experience; similar clerical experience outside the Bureau did not qualify as other specialized experience.

Prior to April, 1977, the modified program was subdivided into two distinct groups: Bureau clerical employees and non-Bureau employees. When a Bureau employee satisfied the threshold requirements for the SA position—including age, a college degree, a drivers license, and the requisite service as a clerical employee—he was scheduled for further processing. This processing included written examinations, an interview, a physical examination and a background investigation. The Bureau graded performance on these tests on a pass/fail basis. Bureau employees who passed all phases of the examinations were considered fully qualified for appointment and were assigned a chronological ranking, based upon their date of qualification. The Bureau employed this ranking to select clerical employees for consideration as Special Agents when appointments were made from the modified program. Other modified program applicants were not given the benefit of the chronological ranking.

Although this special program for Bureau support staff was modified in some particulars over the years, its essential features remained unchanged until April, 1977. At that time, former Bureau clerical employees constituted twenty percent of all Special Agents on duty.

On April 19, 1977, the FBI implemented the "New Special Agent Selection System." The NSASS differed from the former selection system in two important respects: first, this system eliminated pass/fail examinations and the chronological ranking from which clerical members of the modified class were formerly selected and substituted a system in which all applicants were ranked competitively based on their combined test and interview scores, regardless of their date of qualification; second, the new system added two new selection programs, one for women and one for minority groups.

For each selection program, the Bureau now sets a minimum score required to qualify for an interview. The combined test and interview scores are used to select applicants from each category. The Bureau sets the minimum scores for each category on the basis of the number of appointments to be made from each program and the number of applicants in each program pool. Although the minimum scores are adjusted periodically, at all times since the NSASS was adopted, applicants in the modified program, which is composed overwhelmingly of Bureau employees, have been required to achieve the highest test score of applicants in any program in order to qualify for an interview.

Plaintiffs do not claim that the former system accorded them an absolute right to become Special Agents, regardless of their qualifications or the needs of the Bureau. Nor do the defendants deny that members of plaintiffs' class have fared less well under the NSASS. The assertions of the parties are more discreet: plaintiffs maintain that the former "objective method" of testing and qualification [1]—premised on pass/fail examinations and chronological ranking—guaranteed them a "preference" for consideration as Special Agents which was a valuable incident to their employ-

---

1. The policy was so characterized by defendants in the Affidavit of Joseph Doyle Powell, filed June 14, 1979, at ¶ 17 [hereinafter Powell Affidavit].

ment as support personnel. They assert that this preference was a valuable property right arising through implied contract and protected by the fifth amendment. They also allege that the particulars of the NSASS violate the constitutional guarantee of equal protection.

Defendants do not dispute the existence of the former selection policy. Their description of the policy does not differ from plaintiffs' in any material respect. However, defendants dispute the conclusion that the policy constituted a preference to clerical employees. Defendants maintain, moreover, that however the policy is characterized, the Bureau was legally free at any time to alter it without hearing or compensation to those affected. Defendants deny that the NSASS impermissibly discriminates against plaintiffs on account of their race or gender.

*Findings of Fact:*

## II

### A.

1. For many years prior to April, 1977, the Bureau maintained a special program by which clerical employees could qualify for positions as Special Agents. The Bureau never formally codified the program by regulation or its equivalent. However, this policy was generally known throughout the Bureau, and was communicated to prospective clerical employees through defendants' agents charged with recruiting new clerical employees.[2] The Bureau further made the policy known by promulgating changes in the program by official memorandum.[3]

2. The Special Agent Pre-Employment Task Force of the Bureau summarized the mechanics of the program as follows:

The basic prerequisites of the support program as it exists today consist of the employee possessing a four-year resident college degree, reaching age 23, serving three years in a support capacity, and being favorably recommended during the course of a formal interview by both his division head and a representative of the Inspection Staff. Upon attaining these pre-requisites and having maintained an acceptable work record as a support employee, he is listed chronologically with other support employees that have achieved these basic prerequisites. The employee is then afforded the SA written examinations which are given to all applicants under the Modified Program. Upon receiving passing grades on these tests, he will be afforded a complete physical examination at a Government medical facility and, upon being certified for strenuous physical exertion, will be assigned to a New Agents Class dependent upon our needs and vacancies.[4]

3. The Bureau maintained a list of support employees who had fully qualified for Special Agent consideration in all respects in chronological order based upon the date of qualification. The Bureau made all appointments as Special Agents from among clerical employees qualifying through the Modified Program in order from this list.[5]

4. Other applicants in the Modified Program from outside the Bureau did not re-

---

**2.** Deposition of Joseph Doyle Powell, December 8, 1978, at 8–12, 17–19, 152, 155 [hereinafter Powell Deposition]; Deposition of William J. Dawson, January 31, 1979, at 9–11, 16, 76–77; Affidavit of John F. Bonney, filed May 29, 1979, at ¶ 2 [hereinafter Bonney Affidavit]; Affidavit of Adolph Kizas, filed May 29, 1979, at ¶ 9 [hereinafter Kizas Affidavit].

**3.** See, e. g., Dawson Deposition at 70–73; Memorandum to All Special Agents in Charge ("SAC Memorandum"), Memorandum 7–73, dated February 13, 1973, filed as Exhibit 3 to Plaintiffs' Consolidated Exhibits in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendants' Motion to Dismiss

or in the Alternative for Summary Judgment, filed May 29, 1979 [hereinafter "Pl.Con.Ex."].

**4.** Special Agent Pre-Employment Selection System Task Force Findings, March, 1977, at 20, filed as Pl.Con.Ex. 15 [hereinafter Task Force Findings].

**5.** Powell Deposition at 21, 95; Dawson Deposition at 76–78; Answer to Amended Complaint, February 28, 1979, at ¶¶ 8–9; Defendants' Answers to Plaintiffs' First Interrogatories, filed October 30, 1978, at No. 2 [hereinafter Defendants' Answers to Interrogatories]; Kizas Affidavit; Bonney Affidavit.

ceive the benefit of this chronological ranking.

5. The ability of support employees to qualify for Special Agent consideration by the "objective method" based on pass/fail examinations and chronological ranking constituted a valuable benefit to clerical employees in a number of respects: first, it assured employees who had met the minimum qualifications that they would be considered for appointment on the basis of seniority; second, when Special Agent classes had to be filled on short-notice, the existence of a listing of qualified applicants gave clerical employees a substantial practical advantage over non-Bureau applicants, whose availability and qualifications could not be so easily and quickly ascertained;[6] third, the procedure afforded the clerical employees an opportunity to meet all qualifications before vacancies were available, thus reducing a prospective applicant's uncertainty about whether he met SA qualifications and providing an early opportunity to cure deficiencies; fourth, the Modified Program permitted Bureau employees to qualify for appointment on the basis of work experience that would not meet the minimum requirements for entrance under the Modified Program if obtained outside the Bureau; and, fifth, the selection procedure guaranteed to a clerical employee that once qualified for appointment, he could not lose his position on the appointment list to a subsequent applicant, even if that applicant was subjectively better qualified.

6. The Bureau recognized that the program for clerical employees was an exception to its normal policy of competitive recruitment of Special Agents and conferred a preference to those employees.[7]

7. The Bureau made the former selection program known to prospective employees through Special Agents in field offices who were directed to and did recruit persons for clerical positions.[8]

8. The Bureau actively fostered expectations by its clerical employees that upon meeting the minimum qualifications for Special Agent, they would be given preferred consideration for appointment. The clerk-to-agent program was specifically listed in the Bureau's upward mobility manual.[9] It was the stated policy of the Bureau to promote from within, except where a specific skill was required.

On two separate occasions when the Bureau altered aspects of the Modified Program, it expressly made these changes prospective only. In a Memorandum to All Special Agents in Charge (SAC), dated February 13, 1973, the Bureau specifically excepted clerical employees then on duty from a change in the required period of Bureau employment from two to three years, and a reduction of the maximum age for applicants to 36 years.[10]

Similarly, defendant Kelley, in a memorandum dated May 18, 1976, excepted clerical employees interviewed prior to March 2, 1976, from a requirement that clerical employees receive an overall interview rating of "outstanding" (rather than "above average") in order to be considered for SA through the Modified Program.[11]

9. Many college graduates, otherwise over-qualified for clerical positions, entered service with the express purpose of qualify-

---

6. Powell Deposition at 24.

7. Pl.Con.Ex. 10, Memorandum for the Director, dated March 31, 1976; Pl.Con.Ex. 15, Task Force Findings, at 21–22.

8. Kizas Affidavit at ¶ 9; Bonney Affidavit at ¶ 2; Powell Deposition at 7; see also notes 21–24, infra.

9. Pl.Con.Ex. 2 at page iii: "After gaining experience over a stipulated period of time . . . and after meeting certain basic requirements including education, non-Agent personnel are eligible for consideration for the Special Agent position. . . . ."

The policy is described at page 2 as "an integral part of its centralized personnel assignment, promotion and advancement administration." "Action Item D", at 3, calls for dissemination of Upward Mobility plans through posting, conferences, and counselling. Id.

10. Pl.Con.Ex. 3, SAC Memorandum 7–73, dated February 13, 1973.

11. Pl.Con.Ex. 11, Memorandum 21–76, dated May 18, 1976.

ing for the Special Agent position through the Modified Program.[12] Many of these persons would not have accepted clerical positions or maintained employment were it not for their expectation that the program would continue.[13]

10. The defendants were aware that many college graduates accepted support positions with the express purpose of qualifying for Special Agent through the Modified Program.[14]

11. At various times subsequent to 1972, certain documents contained disclaimers with respect to the possibility of a clerical employee becoming an SA, and, on one occasion, officials were directed to deliver oral disclaimers to clerical applicants.[15] These statements, however, suggested only that there could be no guarantee (1) that a clerical employee would become an SA "regardless of qualification";[16] (2) that the minimum requirements applicable to all SA candidates would remain the same;[17] or (3) that because of the number of vacancies

available, a clerical employee would be considered for appointment after serving three years in a clerical position.[18]

None of these disclaimers or reservations was in any way inconsistent with the existence of the preference for clerical employees as it was widely understood; and none of these acts by the Bureau in any way suggested or put plaintiffs on notice that the preference would be removed.[19]

12. At the time of plaintiffs' employment and beyond April, 1977, the Bureau had a need for clerical employees that was described on more than one occasion as "dire."[20]

13. In order to meet the need for clerical employees, the Bureau undertook active recruitment efforts, including the deployment of SA's for full-time recruitment activities,[21] recruitment quotas for each field office,[22] and cash bonuses for specific recruitment efforts.[23] The Bureau considered recruiting to be an aspect of each Special

12. Kizas Affidavit at ¶¶ 10–13; Bonney Affidavit at ¶ 3; *see* note 25, *infra.*

13. Kizas affidavit; Bonney Affidavit. Pl. Con.Ex. 14, Memorandum from W. K. DeBruler to the Director, dated December 16, 1976, states that "the active recruitment of college graduates into lower-level clerical positions for eventual assignment to the position of SA" was Bureau policy.

14. Dawson Deposition at 6; Pl.Con.Ex. 14, *supra*; Pl.Con.Ex. 9, Memorandum to All Special Agents in Charge No. 14–75, dated March 27, 1975 ("Many [college graduates] enter our [clerical] service with the express purpose of later qualifying for the Special Agent position"); Pl.Con.Ex. 11 SAC Memorandum 21–76, dated May 18, 1976; Pl.Con.Ex. 31, Memorandum from W. O. Cregar to R. E. Long, dated October 24, 1978, at 2.

15. *See generally* Pl.Con.Ex. 9, SAC Memorandum 14–75.

16. *See id.*; Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss, *etc.*, May 3, 1979, at 13.

17. *See* Defendants' Answers to Interrogatories, *supra* note 5, Exhibits 1A–1F, "Information Concerning the Position of Special Agent in the Federal Bureau of Investigation." After describing the specific requirements for qualification as SA, this brochure, published between

June, 1969, and August, 1972, cautioned that "[n]o assurance can be given . . . that these requirements will remain in effect."

18. *See* Pl.Con.Ex. 9, SAC Memorandum 14–75; Exhibits to Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment, June 14, 1979, [hereinafter "Def.Ex."], Exhibit 13 (Application Form FD–140); Def.Ex. 14 (Applicant Interview Form FD–190).

19. *See* Powell Deposition at 99–101, 122–23; Dawson Deposition at 75. In this regard, it is noteworthy that the Memorandum from defendant Kelley implementing the use of formal disclaimers in March, 1975, *see* note 18, *supra*, simultaneously ordered that 50 percent of all Special Agent classes should be set aside for members of plaintiffs' class.

20. Pl.Con.Ex. 5, SAC Memorandum 6–74, dated February 5, 1974; Pl.Con.Ex. 6, Memorandum 39–74, dated August 13, 1974; Pl.Con.Ex. 21, Memorandum from S. R. Burns to Mr. Long, dated November 8, 1977.

21. Pl.Con.Ex. 6.

22. Defendants' Answers to Interrogatories, No. 13; Powell Deposition at 102–03.

23. Powell Deposition at 41–43, 103–05.

Agent's duties, regardless of whether he was assigned specific recruitment tasks.[24]

14. In part to fill this need, the Bureau actively recruited college students and graduates for lower-level support and clerical positions (GS–2 and above).[25] The employment of many of these persons was at a grade level below that which their education and experience would ordinarily have qualified them.[26]

15. The Bureau knew that Special Agents, in the course of recruiting clerical and support personnel, made promises of special treatment for clerical employees with regard to Special Agent consideration that may have exceeded the preference in fact accorded by regular Bureau policy.[27]

16. On December 3, 1976, 219 support personnel had met the qualifications for consideration as Special Agents through the Modified Program under the former selection system.[28]

B.

17. On April 15, 1977, defendant Kelley adopted and in October of that year implemented the NSASS.[29]

18. The new system had been recommended by a Task Force appointed by Kelley. Its 16 members represented the Training, Finance and Personnel, Planning and Transportation, and Legal Counsel Divisions of the Bureau and six separate field divisions. Its mandate was to evaluate selection procedure for Special Agents and recommend changes.

19. The purpose of the new system was to ensure that only the best qualified Special Agent applicants are ultimately chosen for that position.

20. The NSASS eliminated the chronological ranking and selection of clerical employees qualified for the SA position. The Task Force considered and rejected a proposal that this change be implemented prospectively, in order to protect clerical employees who had qualified under the former selection procedure.[30]

21. The NSASS established seven selection programs consisting of the five former qualifying programs and, in addition, one each for minorities and females.

22. Under the NSASS, testing for the position of Special Agent is divided into a written examination and oral interview.

23. An applicant may score 50 points on the written test with an additional 5 points available to veterans.

24. In order to qualify for an interview, an applicant must attain a score equal to or greater than the minimum cut-off score for the relevant selection category. The minimum cut-off score for each category is determined by subtracting the maximum interview score (55) from an average appointment score by selection program. In practice, therefore, the score required to obtain an interview will depend upon the number of persons to be appointed from a particular selection program, the performance of other members of the selection group, and the number of applicants in that program.

24. Defendants' Answers to Interrogatories, No. 3; Powell Deposition at 7.

25. Pl.Con.Ex. 14, Memorandum from W. K. De-Bruler to the Director, dated December 16, 1976.

26. Dawson Deposition at 6–8; Powell Affidavit at ¶ 30.

27. Pl.Con.Ex. 8, Memorandum from R. G. Hunsinger to Mr. Walsh, dated March 10, 1975; Pl.Con.Ex. 9, SAC Memorandum 14–75, dated March 27, 1975; Pl.Con.Ex. 10, Memorandum to the Director from William L. Reed, dated March 31, 1976.

28. Powell Deposition at 9–12, 17–19, 152; Pl. Con.Ex. 13, Memorandum from S. R. Burns to Mr. Long, dated December 3, 1976.

29. Pl.Con.Ex. 15, SAC Memorandum 16–77, dated April 15, 1977; Pl.Con.Ex. 17, Memorandum to All Employees, dated April 19, 1977; Pl.Con.Ex. 15, Task Force Report; Pl.Con.Ex. 19, SAC Memorandum 29–77, dated July 20, 1977; Powell Deposition at 152.

30. Pl.Con.Ex. 18, Memorandum from S. R. Burns to Mr. Long, dated May 23, 1977.

25. As of November 8, 1978, and March 1, 1979, the cut-off scores for each selection category were as follows: [31]

|  | Nov. 8, 1978 | March 1, 1979 |
| --- | --- | --- |
| Female | 31.50 | 31.50 |
| Minority | 31.50 | 31.50 |
| Accounting | 32.32 | 32.21 |
| Law | 32.44 | 32.90 |
| Science | 32.08 | 33.62 |
| Language | 35.08 | 31.50 |
| Modified | 37.38 | 38.94 |

26. Although the minimum qualifying score is adjusted every six months, the minimum qualifying score for the modified group has always been the highest of all the selection categories.[32]

27. Between 1960 and 1972, the number of black Special Agents was less than one percent of the total number of agents; between 1973 and mid-1979, the percentage of black Special Agents had risen from one percent to 2.55 percent. No female Special Agents were permitted before 1972; since then, the percentage of female Special Agents has risen to 2.18 percent.[33]

*Conclusions of Law:*

### III

### A.

█ The elements giving rise to a property interest protected by the Constitution have been frequently stated:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead have a legitimate claim of entitlement to it. . . .

*Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The authority is clear that such a property interest can be established by mutual understanding between employer and employee even in the absence of a written contract.[34] According to the Court of Appeals in *Colm v. Vance,* "the source of a protected property right might be implicit in the overall workings of a government employer." 186 U.S.App.D.C. at 135, 567 F.2d at 1128. This understanding may be found from "the objective indicia supporting such a claim in a governing statute, regulation, or in agency-fostered policies or understandings." 186 U.S.App.D.C. at 138, 567 F.2d at 1131.

Were this a dispute between a private employer and its employees, the Court would have no difficulty finding that the representations made by the defendants to the plaintiffs gave rise to an implied contract. For many years, defendants maintained a clearly understood and well-known policy according to plaintiffs and their predecessors a preference in selection for positions as Special Agents. Special Agents in FBI field offices, whose duties specifically included recruitment of clerical employees, and who were rewarded for their recruitment efforts, communicated the existence and essential elements of the clerk-to-agent program to prospective employees. Many individuals accepted clerical positions in express reliance on the program.

Once these individuals joined the Bureau, their reliance on this policy was actively reinforced. The Bureau listed the program in its upward mobility manual. The defendants' conduct in altering the policy only prospectively gave plaintiffs every reason to suppose that the preference would continue, and was entirely consistent with a conclusion that the defendants also so understood the policy.

In return for this preference, the Bureau was rewarded with the services of highly-qualified and highly-motivated persons willing to serve for a substantial period of time in relatively menial positions, lower in challenge, pay, and status than plaintiffs might

---

**31.** Pl.Con.Ex. 32, Memorandum from S. R. Burns to Mr. Long, dated November 8, 1978; Pl.Con.Ex. 35, Memorandum to all Field Offices.

**32.** Pl.Con.Ex. 30, Memorandum from R. E. Long to Mr. McDermott at 6, 7, 14–16.

**33.** Affidavit of Don S. Tokunga, July 18, 1979.

**34.** *See, e. g., Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Ashton v. Civiletti,* 198 U.S.App.D.C. 190, 613 F.2d 923 (1979); *Colm v. Vance,* 186 U.S.App.D.C. 132, 567 F.2d 1125 (1977).

have enjoyed elsewhere. These services were especially useful to the Bureau, because throughout this period, it had "dire" need for more clerical employees. The history of representation, reliance, and mutual exchange of benefits contains all the elements of a classic contract implied in fact [35] or of promissory estoppel.[36]

■ The fact that the employer in this case is the government and that the issues are phrased in terms of a violation of rights guaranteed by the fifth amendment does not alter either the result or the analysis. To secure fifth amendment protection, an interest need not have any special "constitutional" character; rather, constitutional protection is accorded interests that are derived independently from such sources as state law or contract. *Board of Regents v. Roth*, 408 U.S. at 567, 92 S.Ct. at 2704; *Perry v. Sindermann*, 408 U.S. at 603–04, 92 S.Ct. at 2700. (Burger, C. J., concurring). A contract right, such as the one at issue here, is plainly property for the purposes of the fifth amendment, *Perry v. Sindermann*, 408 U.S. at 601–602, 92 S.Ct. at 2699–2700,

which the government cannot destroy without due process [37] or just compensation.[38]

■ Nor is there any longer any doubt that the Government, like any private person or institution, can in certain circumstances be bound through principles of estoppel and implied contract. Both the Supreme Court and the Court of Appeals for this Circuit have had the opportunity to address this issue in recent weeks. *See Hatzlachh Supply Co. v. United States*, 444 U.S. 460, 100 S.Ct. 647, 62 L.Ed.2d 614 (1980); *Molton, Allen & Williams v. Harris*, 198 U.S.App.D.C. 443, 613 F.2d 1176 (1980).

*Molton* reaffirmed that the restrictive rule of *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947), that the government cannot be estopped by the unauthorized actions of an agent, does not apply where the government agent acts within his authority:

Unless as in *Merrill* there is a statute or regulation to the contrary, the government is subject, when it enters the domain of commerce, to the same principles of justice that govern private parties.[39]

---

**35.** *See, e. g.*, 3 A. Corbin on Contracts §§ 561–567 (1960); 1 Williston on Contracts §§ 3, 17–21 (3d Ed. 1961). It is well-settled that contracts of employment may be modified by usage, *see* 5 Williston § 652, or the "common law" of a particular industry, *see United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 579–80, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960).

**36.** *See* Restatement (Second) of Contracts § 90 (Tent. Draft No. 2, 1965):

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

**37.** The gravamen of plaintiffs' complaint is not that they were denied a hearing or other process, but that they were deprived of a benefit to which they had an absolute entitlement. Their substantive claim makes the issue of process essentially irrelevant, *compare Ashton v. Civiletti*, 198 U.S.App.D.C. at 193, 613 F.2d at 926, since they concede no circumstances or grounds, which might be developed at a hearing, that would justify the termination of their vested rights to a preference.

**38.** *See Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934); *United States v. Northern Colorado Water Conservancy District*, 449 F.2d 1, 3–4 (10th Cir. 1971) (abrogation of implied contract by United States gives right to just compensation).

**39.** 198 U.S.App.D.C. at 446, 613 F.2d at 1179. There can be no doubt that this rule applies as well to employment situations. Were it otherwise, the conclusion that a contractual property right may arise by implication from "words and conduct", *Perry v. Sindermann*, 408 U.S. at 602, 92 S.Ct. at 2700, *quoting* 3 A. Corbin on Contracts § 562, would be without meaning. *See also Ashton v. Civiletti, supra*. Nor can there be any doubt in the instant circumstances that Special Agents expressly authorized—indeed, required—to recruit clerical personnel had authority to explain to potential clerical employees the dimensions of existing Bureau policy. *See* Finding of Fact No. 13, *supra*. Addressing a similar situation in *Baker v. F & F Investment Co.*, 489 F.2d 829, 834 (7th Cir. 1973), the Seventh Circuit held *Merrill* inapplicable where the representations at issue were "in accordance with agency policy rather than contrary thereto." The Court has no occasion to consider whether promises to potential clerical employees in excess of Bureau policy, *see* Finding of Fact No. 15, *supra*, would bind the

The Court of Appeals went on to find waiver of a condition precedent from, *inter alia*, "inferences from the words and actions of the parties," 198 U.S.App.D.C. at 446, 613 F.2d at 1179, industry custom, *id.* at ——, 613 F.2d at 1180, and principles of equity, *id.* at 447, 613 F.2d at 1180, *citing* 5 Williston on Contracts § 679 (3d ed. 1957). *Hatzlachh*, a case involving an implied contract of bailment, reaffirmed that even in the absence of statutory tort liability, the United States may be liable on contracts implied in fact. 444 U.S. at 462–463, 100 S. Ct. at 649. As was succinctly stated by Chief Justice Waite more than a century ago:

> The United States, when they contract with their citizens, are controlled by the same laws that govern the citizen in that behalf. All obligations which would be implied against citizens under the same circumstances will be implied against them.[40]

These most recent cases, as well as the authority upon which they rely, stand for the proposition that in its dealings with its citizens, the government is obligated to deal squarely, and that courts will enforce these obligations. As Justice Jackson put it in a dissenting opinion in *Federal Crop Insurance Corp. v. Merrill*, which is gaining authority over the years:

> It is very well to say that those who deal with the Government should turn square corners. But there is no reason why the square corners should constitute a one-way street.

Bureau. These types of representations might well fall within the *Merrill* rule. However, the contract the Court finds herein is based on express Bureau policy, not any *ad hoc* representations. Since the rationale of *Merrill* is, *inter alia*, to charge citizens dealing with the government with knowledge of government policy, *see Molton*, 198 U.S.App.D.C. at 445–446, 613 F.2d at 1178–1179, it would be error to hold that *Merrill* prevents the plaintiffs from relying on accurate representations of existing policy made by authorized agents.

40. *United States v. Bostwick*, 94 U.S. 53, 66, 24 L.Ed. 65 (1877); *see also Reading Steel Casting Co. v. United States*, 268 U.S. 186, 45 S.Ct. 469, 69 L.Ed. 907 (1925); *Algonac Manufacturing Co. v. United States*, 428 F.2d 1241, 192 Ct.Cl. 649 (1970); *Gay v. United States*, 356 F.2d 516,

332 U.S. at 387–88, 68 S.Ct. at 5. It would be anomalous, indeed, if the government were to be held here to a lower standard in dealing with its own employees, with whom it has special ties of loyalty as well as sovereignty, than with outside contractors.

[5] Those principles applied to the undisputed facts of this case establish that the chronological ranking system for support personnel aspiring to positions as Special Agents was a contractual right of those persons entering service before April, 1977. This preference was a valuable—perhaps the most valuable—benefit pertaining to those positions. It was a well-known part of a common-law of FBI employment, understood by the defendants and fostered by their representations to the plaintiffs both as inducements to accept clerical positions and, during plaintiffs' service, by FBI statements of promotion policy. It was understood and recognized at all levels of the FBI command, and by the obvious and visible practice of two decades.

Defendants' denials that a "clerk-to-agent program" existed and that the policy was "mutually understood" do not raise genuine questions of material fact. The denial of the existence of a "program" is simply a semantic formulation that lacks any factual substance. No one disputes what the Bureau's former policy was, or that it was "radically" changed by the implementation of the NSASS.[41] The asserted lack of "mutuality" likewise fails to raise a factual dispute. The fact that defendants

524, 174 Ct.Cl. 420, *cert. denied*, 385 U.S. 898, 87 S.Ct. 202, 17 L.Ed.2d 130 (1966).

41. *See* Affidavit of Clarence M. Kelley, August 13, 1979, at ¶ 5:

> I was aware when I approved the NSASS that the mechanics of selection would be radically changed and that this change in procedure would effect the manner in which FBI support employees were considered for Special Agent Appointment. However, I was also aware that the FBI Task Force which recommended the adoption of the NSASS to me had specifically considered the FBI's responsibility towards its support employees in this area and that the Task Force had rejected any considerations of preferred treatment of support employees under the NSASS.

knew about, understood, and nurtured the former policy, and accepted the benefits flowing to the Bureau from its existence are not in dispute.[42] Defendants merely assert that the undisputed facts do not satisfy a legal standard of "mutuality." Where the underlying facts are not in dispute, and the parties contest only the legal conclusions to be drawn from them, summary judgment is appropriate.[43]

The holding here does not imply that every aspect of FBI employment gives rise to vested contractual rights and that defendants are never free to alter the terms of employment without compensation. *See Colm v. Vance*, 186 U.S.App.D.C. at 137 n.

7, 567 F.2d at 1130 n. 7. The policy at issue was significant both to the Bureau and to the affected employees; it was well-understood and regularly used, and stood apart in character and significance from other aspects or incidents of FBI employment. It was not a mere condition of employment. The preference was a significant element of compensation for which the Bureau received valuable service beyond what could have been received for the salary paid, but for the preference. The Bureau could no more take away this valuable preference without liability than it could refuse to pay an agreed amount of salary to one of its employees.

**42.** In the Affidavit of Joseph Doyle Powell, filed June 14, 1979, as an exhibit to Defendants' Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment, defendants asserted for the first time (after more than a year of litigation), that the chronological ranking of support employees was not begun until August, 1973, and that the chronological list contained the names of support employees who had met the threshold requirements for consideration, but who were not fully qualified. *See* Powell Affidavit at ¶ 15. The Powell Affidavit directly contradicts Defendants' Answer to Plaintiffs' Complaint, July 25, 1978, Defendants' Answer to Plaintiffs' Amended Complaint, February 28, 1979, Defendants' Answers to Interrogatories, October 30, 1978, and the Powell Deposition, December 8, 1978. *See* note 5, *supra*. In each, defendants expressly acknowledged that the Bureau had, without modification, maintained a chronological list of clerical employees fully qualified for appointment and made selections for SA in order from this list. This about-face coincided with defendants' apparent understanding, for the first time, that plaintiffs were asserting a right to a preference for consideration, of which the chronological listing was a key element, not a guarantee of appointment. *See* Memorandum of Points and Authorities, June 14, 1979, at 3 ("Plaintiffs' effort to change horses in midstream must fail").

It is difficult to regard the Powell Affidavit as anything but a last-minute effort by the defendants to raise an issue of material fact precluding summary judgment. The Affidavit was Mr. Powell's third opportunity to present evidence in this case, having earlier verified defendants' answers to interrogatories and testified at deposition. Moreover, the affidavit fails "to set forth specific facts" supporting the defendants' new position, as required by Rule 56(e). In view of all the circumstances, the Court does not treat Mr. Powell's contention as raising a genuine issue of material fact, particularly

since it seeks to impeach prior testimony that was the subject of cross-examination. *See Perma Research and Development Co. v. Singer*, 410 F.2d 572, 578 (2d Cir. 1969); *but see Thyssen Plastik Anger KG. Induplas, Inc.*, 576 F.2d 400 (1st Cir. 1978). To do otherwise "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma Research and Development Co. v. Singer*, 410 F.2d at 578.

Additionally, careful examination of the Powell Affidavit leads to the conclusion that it does not contradict the substance of plaintiffs' argument. Mr. Powell states that the FBI did not introduce the chronological ranking until 1973 because prior to that time, clerical employees had no difficulty in achieving appointment after qualifying; when an increasing number of qualifying clerical employees and a reduction in the number of SA vacancies prevented the appointment of most applicants, the chronological listing was developed *for modified applicants only*. *See* Powell Affidavit at ¶¶ 15–17. This approach does not contradict the general outline of the "objective" system of appointment upon which clerical employees justifiably relied.

**43.** *See Spark v. Catholic University of America*, 167 U.S.App.D.C. 56, 510 F.2d 1277 (1975); *Dewey v. Clark*, 86 U.S.App.D.C. 137, 180 F.2d 766, 772 (1950); *Fox v. Johnson & Wimsatt, Inc.*, 75 U.S.App.D.C. 211, 218–19, 127 F.2d 729, 736–37 (1942) ("Conflict concerning the ultimate and decisive conclusion to be drawn from undisputed facts does not prevent rendition of a summary judgment, when that conclusion is one to be drawn by the court.")

It is settled that in the circumstances such as those here, summary judgment may be employed to determine the existence of an implied contract, *Bloomgarden v. Coyer*, 156 U.S.App. D.C. 109, 479 F.2d 201, 210 (1973), or a constitutional property right arising from an implied promise, *see Ashton v. Civiletti*, 198 U.S.App. D.C. at 198, 613 F.2d at 931.

Moreover, the Bureau might have limited its liability through explicit statements that the preference accorded clerical employees through the modified program might be altered at any time. Such a statement might at least have avoided the creation of a property interest in employees joining the Bureau after the date on which the disclaimer was adopted. To be effective in defeating expectations of clerical employees, the statement would have to have been clearly addressed to the preference at issue and to the employees or prospective employees concerned. The notices by defendants after 1972 that clerical employees could not be "guaranteed" advancement to Special Agent are too vague, too broad, and too imprecise to limit the preference here at issue, *see Ashton v. Civiletti, supra,* 198 U.S.App.D.C. at 196–198, 613 F.2d at 929–931, particularly in view of the importance, duration, and widespread knowledge of the policy. Indeed, plaintiffs have never claimed a "guarantee" of advancement, only a preference for consideration. The disclaimers, if they can be characterized as such, are best understood as addressing absolute promises of advancement that some recruiters made to clerical applicants in excess of their authority. *See* Findings of Fact No. 15, *supra.* These representations are not the basis of plaintiffs' property right.[44]

### C.

■ Defendants advance two arguments that they claim prevent the Court from finding a protected property interest regardless of the factual circumstances. First, defendants assert that there is no statutory or administrative limitation on the authority of the Bureau to discharge its employees for any reason, citing 28 U.S.C. § 536 (exemption from competitive civil service) and 28 C.F.R. § 0.137 (hiring authority vested in Director and designated officials). Defendants conclude from these provisions that the FBI is also free to alter the terms of employment, and that any representa-

tions made to the plaintiffs "would have been made in direct violation of the legal authority of the Bureau to exercise complete discretion in its authority to hire employees, and would therefore have been void." Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, filed May 3, 1979, at 10.

Since oral argument in this case, the Court of Appeals for this Circuit has addressed precisely the issue raised by the defendants. Concluding that the statutory provision does not prevent an FBI clerical employee from deriving a property interest in his job as the result of Bureau policies and understandings, the Court noted that the statutory provisions:

do not prevent the Bureau from giving its employees some security in their jobs. We are convinced that the FBI has fostered rules and understandings which, by entitling appellant to believe that he would lose his job only for a job-related reason, gave him a property interest in his position . . . . .

*Ashton v. Civiletti,* 198 U.S.App.D.C. at 195, 613 F.2d at 928. Similarly, the regulation vesting authority to hire in the Director does not limit the Bureau's legal authority to confer substantive rights incident to employment.

■ Second, defendants rely on the so-called "Testan Rule" that "one is not entitled to the benefit of a position until he has been appointed to it," *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). On this authority they assert that plaintiffs cannot maintain a claim for relief. Defendants' reliance on *Testan* is misplaced. Plaintiffs do not demand the right to appointment as Special Agents, or the pay or privileges of that rank. Rather, they claim a benefit incident to their employment as clerks, namely, a promotional preference. Plaintiffs have been deprived of an employment opportunity promised to

---

44. *See* note 39, *supra.*

them to compensate them for the clerical or support work they undertook. A claim of this type, like a claim for unpaid salary, clearly falls outside the *Testan* rule. 424 U.S. at 402, 96 S.Ct. at 955.

D.

■ Plaintiffs plainly are entitled to some relief. The circumstances of plaintiff Kizas are illustrative. According to his affidavit, Kizas, then a part-time college student and employed at U.S. Steel, applied to the Bureau in January, 1973, because it appeared to offer the best opportunities available to him for future advancement. Kizas discussed with Special Agents at the Philadelphia office the details of the modified program; only after learning of the advantages that it offered for eventual consideration as a Special Agent did Kizas accept appointment to a clerical position over alternative job opportunities then available to him. In order to accept the position, Kizas and his wife quit their jobs and moved from Philadelphia to Washington, where Kizas began work as a GS–2 clerk. The clerical job with the Bureau paid only 40 percent of his former salary. Kizas met the threshold requirements for consideration as Special Agent in June, 1976, and expected, not unreasonably, to be considered chronologically with other clerks seeking appointment through the modified program. Kizas was still awaiting consideration in April, 1977, when the NSASS was instituted. He states without contradiction that if he had known in 1973 that he would not eventually receive special consideration for appointment as SA by virtue of his clerical service, he would never have accepted employment at a reduced salary and moved to Washington. *See* Kizas Affidavit at ¶¶ 5–19.[45]

Money damages are an appropriate remedy for the damages suffered by plaintiff Kizas, and others similarly situated, in reliance on the continued existence of the preference. The situation here is similar to that in *McAleer v. ATT*, 416 F.Supp. 435 (D.D.C.1976), in which the Court awarded money damages (but not equitable relief) to a male employee who was the victim of sex discrimination when the defendant, his employer, granted a preference to women for promotion pursuant to the terms of a Consent Decree entered in another action. Judge Gesell refused there to interfere with the Consent Decree, which had the effect of remedying apparent past discrimination. However, he concluded that the burden of the change in promotion policy should not fall to innocent employees. Judge Gesell stated that there was no reason why:

> in equitably distributing the burden among the concerned parties the onus should be shifted from the employer responsible for the discrimination to the blameless third-party employee any more than is, as a practical matter, unavoidable.

416 F.Supp. at 440.

Similar considerations prevail here: first, money damages are an available remedy for an uncompensated taking or breach of an implied contract; second, the nature of the injury suffered by plaintiffs most closely resembles a form of detrimental reliance for which money damages is most appropriate; third, the FBI is charged with important law enforcement responsibilities, including the enforcement of the Civil Rights laws. Defendants did not formulate the former policy, and were not responsible for the manifest racial and sexual imbalance among the ranks of Special Agents. They should not be prevented by the Court from bringing about substantial changes that

---

**45.** According to the Powell Affidavit, at ¶ 30, of the 48 named plaintiffs in this action, 32 entered on duty with a college degree. Of these, 20 were assigned to GS–2 positions. Testimony of a Bureau witness, *see* Dawson Deposition at 7, is clear that "[u]sually, elsewhere in the government, a person with a college degree

gets a midlevel type GS rating," which he identified, *id.*, as GS 5–7.

The extent of the loss of income that plaintiffs suffered, and their exact qualifications, go to the amount of damages to be awarded, and not the presence or absence of detrimental re-

they find necessary and appropriate.[46] Equitable relief, in the form of requiring specific performance of the former system of preferential consideration, is not necessary to afford relief, nor would it otherwise be proper.

The legal remedy by way of money damages is thoroughly appropriate. The public will benefit from whatever improvements the NSASS brings to the FBI and, in fairness, the public should bear the cost of effecting the change. If, as defendants insist, the continued existence of the preference for clerical employees was inconsistent with the implementation of the NSASS then plaintiffs should be compensated for the termination of this benefit. Both the fifth amendment and elementary principles of fair play require nothing less.

Any attempt at this stage to resolve the amount of damages to be awarded or to design procedural mechanisms for adjudication of the damage claims of class members would be premature. Indeed, it may well be impossible to compensate plaintiffs precisely; money damages awarded on the basis of "rough justice" are in order. *McAleer v. ATT*, 416 F.Supp. at 440.

In achieving "rough justice" some, all (or none) of the following factors might be considered:

(1) the educational and professional qualifications of individual plaintiffs at the time they were appointed to clerical position;

(2) the salary the plaintiffs were earning or might have earned had they not accepted employment with the FBI;

(3) the grade at which plaintiffs were employed by the Bureau; and

(4) the length of time plaintiffs served prior to April, 1977.

These factors are not exhaustive, and the parties are invited to suggest others used to measure each plaintiff's damages.

Accordingly, by accompanying Order, the parties are directed to submit memoranda addressing the procedural questions that the Court must face in adjudicating the damage claims. The questions which the parties should consider include:

(1) decertifying the class and permitting the individual plaintiffs to file amended complaints relying on the declaratory judgment entered herein; [47]

(2) whether the damage claims of the plaintiffs are aggregable so that exclusive jurisdiction to award damages lies in the Court of Claims; *see* 28 U.S.C. §§ 1346, 1491; and

(3) whether the damage actions should be heard by this Court or before the Court of Claims. In addition, the parties are invited to offer guidance and suggestions on the appropriate procedures for considering the claims of the class members.

## IV

There remains the question of whether the defendants are liable in their individual capacities for money damages. Even though the defendants have infringed upon plaintiffs' constitutional rights, a qualified immunity bars imposition upon them of liability for damages.[48]

liance by the plaintiffs, which has been convincingly established.

**46.** The manifest imbalance in the employment of women and minorities at the FBI is similar to the discrimination judicially noticed by the Supreme Court in *United Steelworkers of America v. Weber*, 443 U.S. 193, 198 n. 1, 99 S.Ct. 2721, 2724 n. 1, 61 L.Ed.2d 480 (1979), and by Judge Gesell in extrapolating from a prior consent decree in *McAleer v. ATT*, 416 F.Supp. at 439. As in *Weber* and *McAleer*, the Court here makes no finding that the FBI was guilty of discrimination. However, the existence of clear imbalances is noticed by this

Court and is a factor in the Court's decision not to order equitable relief.

**47.** Both parties have treated this suit as essentially a suit against the United States. However, the Court takes no position at this time about whether, or the degree to which, the United States is bound by the Court's finding on the merits. *See generally* Hart & Wechsler, The Federal Courts and The Federal System 1371–77 (2d Ed. 1973).

**48.** *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Wood v. Strickland*, 420 U.S. 308, 95

Our Court of Appeals has recently addressed the bases for qualified immunity in *Halperin v. Kissinger*, 196 U.S.App.D.C. 285, 606 F.2d 1192 (1979). The Court noted that the Supreme Court had adopted for federal officials the "objective and subjective standards for qualified immunity" of *Wood v. Strickland*:

[An official] is not immune * * * [A] if he knew or reasonably should have known that the action he took * * * would violate the constitutional rights of the [person] affected, or [B] if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury * * *.

196 U.S.App.D.C. at 302, 606 F.2d at 1209. *Halperin* specifically acknowledges the emphasis placed by the Supreme Court in *Butz v. Economou* on the use of summary procedures to prevent harassment of officials. *Butz, Procunier,* and *Halperin* all make clear that the defendants are not required to proffer evidence of their reasonableness or good faith until plaintiff has met the burden of alleging and proffering evidence of bad faith.

Based upon the evidence submitted by the plaintiffs, and the uncontroverted affidavits of defendants Webster and Kelley, filed August 13, 1979, at the direction of the Court, the Court concludes that the defendants are entitled to summary judgment on the issue of their individual liability.

The claims raised in this case raise difficult questions of constitutional law. Defendants are not chargeable with error in predicting the course of constitutional law in this field of personnel rights. *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). Under these circumstances, no liability can attach under the so-called "objective" standard of liability.

Neither is there any issue of fact as to the "subjective" basis of liability relating to the good faith of the defendants. Plaintiffs

do not explicitly allege that the defendants acted maliciously in depriving plaintiffs of their fifth amendment rights. This failure to allege bad faith is alone grounds to grant summary judgment to defendants. *Halperin v. Kissinger*, 196 U.S.App.D.C. at 302 n. 119, 606 F.2d at 1209 n. 119. More significantly, plaintiffs proffer no evidence which, if proven, would establish malicious intent. At most, the suggestions that defendant Kelley failed to inquire sufficiently into the role the FBI legal counsel played in developing the NSASS would establish negligence on defendant Kelley's part. Such an allegation precludes the possibility of malice. *Procunier v. Navarette*, 434 U.S. at 566, 98 S.Ct. at 862; *Halperin v. Kissinger*, 196 U.S.App.D.C. at 302 n. 119, 606 F.2d at 1209 n. 119. The plaintiffs have proffered no facts that question the good faith of defendant Webster. Accordingly, defendants enjoy official immunity for their acts.

### V

In view of the resolution of plaintiffs' claims of an uncompensated taking, it is not necessary for the Court to address the other fifth amendment and Title VII claims. Were the Court to find that the NSASS violated Title VII or the fifth amendment guarantee of equal protection, plaintiffs probably would receive the same relief already proposed here.[49] No purpose would be served, therefore, by considering the questions raised by plaintiffs' claims of discrimination. Courts traditionally avoid considering constitutional questions where alternative grounds of decision are available. These principles of adjudication are particularly applicable here.

### ON MOTIONS TO AMEND JUDGMENT AND AMEND COMPLAINT

#### I.

This case is before the Court on several motions filed by both parties following the

---

S.Ct. 992, 43 L.Ed.2d 214, *rehearing denied*, 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 790 (1975); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

**49.** As Judge Gesell made clear in his opinion in *McAleer v. ATT*, 416 F.Supp. at 439, the Court

has substantial discretion in determining the type of relief to award even if a finding of discrimination is made. *See also* 42 U.S.C. § 2000e–5(g); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975).

Court's Memorandum and Order of February 15, 1980. Plaintiffs have moved (a) pursuant to Rule 59(e), Fed.R.Civ.P., to amend the judgment to retain jurisdiction over the Title VII claims asserted in Count II of the amended complaint; and (b) pursuant to Rule 15(b) and (c), Fed.R.Civ.P., to amend the complaint by adding the United States as a defendant and alleging jurisdiction under the Tucker Act, 28 U.S.C. § 1346(a)(2) (1976). Defendants oppose any exercise of jurisdiction over Count II, and have renewed their motion to dismiss the Title VII claims for lack of exhaustion of administrative remedies. In addition, defendants have moved to dismiss the remaining elements of Count I or to transfer the money claims to the Court of Claims.

Having carefully reviewed the arguments of both sides, the Court has determined (1) that the dismissal of Count II should not be disturbed; (2) that plaintiffs should be permitted to add the United States as a party defendant; and (3) that exclusive jurisdiction over the damage claims of those class members alleging damages in excess of $10,000 lies in the Court of Claims. By accompanying Order, the Court will offer plaintiffs the opportunity to choose between transferring the damage claims of all class members to the Court of Claims pursuant to 28 U.S.C. § 1406 or bifurcating the class into two groups: those with damage claims not in excess of $10,000 and those with claims in excess' of $10,000. This Court would retain jurisdiction over the claims of the former class pursuant to 28 U.S.C. § 1346(a)(2).

## II. Count II

By Memorandum and Order of February 15, 1980, the Court dismissed Count II of the amended complaint, which charged that the minority and female qualifying programs of the New Special Agent Selection System ("NSASS") discriminated against plaintiffs in violation of Title VII and the fifth amendment. The Court determined that the plaintiffs could obtain complete relief from adjudication of Count I and dismissed Count II rather than reach the difficult factual and constitutional issues it raised.

By their motion to alter or amend the judgment, plaintiffs seek reconsideration of this action. Plaintiffs maintain that relief under Count II would not be co-extensive with that contemplated by Count I for violation of an implied contract. In particular, plaintiffs note that the NSASS followed the abrogation of their contractual preference that was the subject of Count I, and thus covered a different time period, and that Title VII permits the award of attorney's fees, which might not be available for Count I.

Assuming arguendo that the relief for the two counts is not substantially the same, Count II must nevertheless be dismissed on the grounds that plaintiffs failed to exhaust their administrative remedies. It is clear initially that Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16 (1976), constitutes the exclusive remedy for claims of employment discrimination by federal employees subject to its protection. *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Brown v. GSA,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). It is equally clear that claims under Title VII may not be brought in federal court where the plaintiffs have failed properly to raise their contentions at the administrative level. *Brown v. GSA,* 425 U.S. at 832, 96 S.Ct. at 1967; *Hackley v. Roudebush,* 171 U.S.App.D.C. 376, 520 F.2d 108 (1975).

Plaintiffs claim that on several occasions they complained informally about the effects of the NSASS and that defendants have refused to provide any relief. Plaintiffs do not seriously suggest that such complaints are an acceptable substitute for the formal procedures provided in Title VII. Nor can plaintiff maintain that such inquiries demonstrate the "futility" of administrative recourse so as to justify their failure to exhaust. The law in our circuit is clear that the mere assertion that the administrative recourse is futile will not relieve a plaintiff of the duty to exhaust, particularly where the defendant is a federal agency and there exist formal avenues for adminis-

trative redress. *League of United Latin American Citizens v. Hampton*, 163 U.S. App.D.C. 283, 501 F.2d 843 (1974).

▪ Plaintiffs suggest that this Court exercise ancillary jurisdiction over the Title VII claims. Such an exercise of jurisdiction would be inappropriate, even if feasible. Adjudication of Count II would involve substantial factfinding and would require the commitment of substantial resources by the Court and the parties. Moreover, as plaintiffs now maintain, the facts surrounding Count II arise later than and are not integrally related to those in Count I, which has already been adjudicated. Finally, in view of the Court's disposition of Count I, adjudication of Count II is not necessary to protect the integrity of the main proceeding. Under these circumstances, the exercise of ancillary jurisdiction would be improper. *See Morrow v. District of Columbia*, 135 U.S.App.D.C. 160, 417 F.2d 728, 740 (1969).

In view of the foregoing, the Court need not address and does not decide the question it raised in oral argument that the issues in Count II have not been raised in sufficient adversarial context to permit a decision.

### III. Count I: Jurisdiction

#### A.

With the entry of the declaratory judgment and the denial of injunctive relief on February 15, 1980, this action became one essentially for money damages against the United States. Accordingly, it is necessary to address the issues posed by the overlap of jurisdiction between this Court and the Court of Claims under the Tucker Act, 28 U.S.C. §§ 1346(a)(2) and 1491, which both parties agree is the sole independent basis for jurisdiction over the remaining claims.

The Tucker Act provides for concurrent jurisdiction in the District Court and the Court of Claims for actions in which the amount claimed is not in excess of $10,000.[1] Where the claim exceeds $10,000, exclusive jurisdiction lies in the Court of Claims.[2]

Plaintiffs have sought leave to file a Second Amended Complaint alleging jurisdiction pursuant to section 1346, but not specifying any amount claimed. They assert that it is now impossible to evaluate each plaintiff's claim because the Court has yet to determine the manner of valuation. However, plaintiffs represent that at least some members of the class have suffered damages of less than $10,000. *See* Plaintiff's Reply to Defendants' Supplemental Memorandum of Points and Authorities in Support of Motion to Dismiss or, in the Alternative, for Transfer to the Court of Claims, April 17, 1980, at 3–4. Plaintiffs suggest, *see id.* at 4–5, that this Court retain jurisdiction of all claims under any one of three theories: first, that because there exist some class members for whom there is jurisdiction in this Court, the Court may retain jurisdiction over the entire class; second, that because jurisdiction over all the claims of the class was initially proper under 28 U.S.C. § 1331 without regard to the amount claimed, all the damage claims under the Tucker Act may be adjudicated as pendent or ancillary to the original claim. Finally, plaintiffs urge that they not be required to allege an amount claimed until all matters relating to valuation have been adjudicated. Then, only those claims valued in excess of $10,000 would be transferred to the Court of Claims for entry of judgment.

---

1. 28 U.S.C. § 1346(a) provides in pertinent part:

   (a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:

   (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation in an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

2. 28 U.S.C. § 1491 provides:

   The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

Defendants argue that since damage claims may be substantial, plaintiffs should be required either to waive all claims for damages in excess of $10,000, *see Vander-Molen v. Stetson*, 187 U.S.App.D.C. 183, 571 F.2d 617, 619 n.1 (1977), or transfer this action to the Court of Claims pursuant to 28 U.S.C. § 1406. Defendants rely on a number of cases involving military officers in which claims for mandamus or declaratory relief were joined with claims for back pay. In each, the courts held that since the claims were essentially actions for money against the United States (and the amount sought exceeded $10,000), jurisdiction lay in the Court of Claims. *See Denton v. Schlesinger*, 605 F.2d 484 (9th Cir. 1979); *Cook v. Arentzen*, 582 F.2d 870 (4th Cir. 1978); *Polos v. United States*, 556 F.2d 903 (8th Cir. 1977); *Carter v. Seamans*, 411 F.2d 767 (5th Cir. 1969), *cert. denied*, 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970).

■ Upon reflection, the Court has determined that if plaintiffs desire to continue this action in District Court, the proper course is to bifurcate the class to retain only those claims of class members seeking damages not in excess of $10,000. The various alternatives proposed by plaintiffs to retain jurisdiction over all the claims would do violence to the careful division of jurisdiction mandated by Congress and would frustrate the intent of Congress that the expertise of the Court of Claims be employed in all cases in which the damages sought against the United States exceed $10,000.

■ Plaintiffs can offer no authority to support either of their theories of ancillary jurisdiction. Jurisdiction over the claims of class members depends upon the amount claimed individually by class members. *March v. United States*, 165 U.S.App. D.C. 267, 506 F.2d 1036, 1309 n.1 (1974); *Fox v. City of Chicago*, 401 F.Supp. 515 (N.D.Ill.1975). It is well-established that in class actions, the Court must have jurisdiction over each plaintiff; claims of class members over whom the court lacks jurisdiction cannot be adjudicated as ancillary or pendent to the claims of those class members for whom jurisdiction lies. *Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1974); C. Wright, Law of Federal Courts 355–56 (1976); *see also March v. United States*, 506 F.2d at 1309 n.1; *Fox v. City of Chicago*, 401 F.Supp. at 518.

Plaintiff's reliance on *Commonwealth of Pennsylvania v. National Association of Flood Insurers*, 520 F.2d 11, 25 (3rd Cir. 1975) is misplaced. There, the Court of Appeals merely noted that the District Court erred in aggregating the claims of class members in determining jurisdiction under the Tucker Act. The Court additionally noted that dismissal of all claims was proper since no individual class members' claim met the jurisdictional limits of section 1346(a)(2). Nowhere does the Court suggest that the District Court might have retained jurisdiction over the entire class if there were jurisdiction over some individual claims. *See* 520 F.2d at 25.

■ Neither would it be proper for the Court to retain jurisdiction over all the damage claims as pendent to the original constitutional claim under 28 U.S.C. § 1331. Plaintiff offers no authority for the proposition that damage claims against the United States can be adjudicated as ancillary to claims for which there is federal question or mandamus jurisdiction. Indeed, the Courts that have considered this argument have rejected it. *Denton v. Schlesinger*, 605 F.2d at 486 n.4; *Glines v. Wade*, 586 F.2d 675, 681–82 (9th Cir. 1978), *rev'd on other grounds sub nom. Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980).

Plaintiffs nevertheless raise a difficult question. Where a claim for declaratory or injunctive relief raising a clear federal question is coupled with or may result in a claim against the United States for money damages, there is a potential for conflict between the Court of Claims, which has exclusive jurisdiction over money claims in excess of $10,000, and the District Court, whose jurisdiction under sections 1331, 1361 and 2201 of Title 28 is exclusive. Defendants would have the District Court defer in all cases, and imply that this Court was

without authority to issue a declaratory judgment with binding collateral effect. Plaintiffs would have the District Court retain jurisdiction up to the point at which a money judgment literally must be entered, only then transferring claims in excess of $10,000 to the Court of Claims for entry of final judgment. The authorities cited for both parties are not particularly helpful. Defendants draw the Court's attention to a number of cases involving the military in which claims for declaratory relief were coupled with claims for back pay in excess of $10,000. In each case, the Court of Appeals found that the money claims were the essence or keystone of the plaintiffs' claims; they held that for the District Court to adjudicate the declaratory aspects of the case would usurp the jurisdiction of the Court of Claims by deciding the principal legal issue in the case. In each, the Courts of Appeals approved or ordered the District Court to defer to the Court of Claims. *See e. g., Denton v. Schlesinger*, 605 F.2d at 486–88; *Cook v. Arentzen*, 582 F.2d at 878; *Carter v. Seamans*, 411 F.2d at 776 (District Court opinion incorporated by reference); *see also Larsen v. Hoffman*, 444 F.Supp. 245 (D.D.C.1977).

These cases offer little guidance here, however, for two reasons: first, in those cases it was clear at the outset that money was the essence of the plaintiff's suit. By contrast, the plaintiffs here raised difficult and novel constitutional questions that they hoped to resolve by a declaratory judgment in a court with jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201 and thereby become entitled to injunctive relief. The possibility of money damages became central at a late stage of the proceedings only after the Court declined to award injunctive relief and after the principal legal issue had been adjudicated. Second, in the military cases cited by defendant, the Court of Claims had been awarded special statutory authority to award equitable relief, so that by sending the plaintiffs to the Court of Claims, the Courts of Appeal were not forcing them to litigate in two forums. *See, e. g., Cook v. Arentzen*, 582 F.2d at 877; *Carter v. Seamans*, 411 F.2d at 773–74.

Plaintiffs rely exclusively on *Melvin v. Laird*, 365 F.Supp. 511 (E.D.N.Y.1973). There, the District Court refused to dismiss an action for declaratory relief but not for damages simply because the ultimate effect of a declaration of rights might be a damage claim in excess of $10,000. The Court concluded that where substantial rights were involved in addition to a potential money claim, the jurisdiction of the District Court under 28 U.S.C. §§ 1331 or 1361 was not eliminated by a potential and speculative monetary recovery in the Court of Claims under the Tucker Act. 365 F.Supp. at 519; *see also Glines v. Wade*, 586 F.2d at 681.

In *Melvin*, the District Court was faced with a decision at the outset of the suit whether to defer to the Court of Claims. It was not faced, as the Court is here, with the problem of how to proceed after the legal issues had been resolved and only a damage claim remained. Indeed, in *Melvin* the District Court specifically reserved the question of how its jurisdiction might be affected if the plaintiff ultimately sought money damages. 365 F.Supp. at 520.

The problem faced by the District Court in *Melvin* is far more like that addressed by this Court at the outset of this action. The Court agrees that like the plaintiffs in *Melvin*, the potential of a monetary recovery did not deprive the court of jurisdiction to consider whether the plaintiffs were entitled to declaratory or injunctive relief pursuant to sections 1331, 1361 or 2201 of Title 28. Having resolved that issue, however, the Court cannot escape the conclusion that whatever else this action might have been, it is *now* in essence an action for money damages. If the claims exceed $10,000, jurisdiction lies exclusively in the Court of Claims. 28 U.S.C. § 1491. *See Larsen v. Hoffman*, 444 F.Supp. at 255. As the Court of Appeals notes in *Glines v. Wade*, "[t]he government, of course, could not relitigate in that forum any issues which have been decided against it here." 586 F.2d at 682.

This result, which will occasion either the transfer of all claims to the Court of Claims

or a bifurcation of the class and a transfer of some claims, will result in some hardship to the plaintiffs. Nevertheless, it is consistent with the statutory division of responsibility between the District Court and the Court of Claims. The cases are clear that the extension of jurisdiction to the District Court to adjudicate money claims of $10,000 or less was not intended to restrict the exclusive jurisdiction of the Court of Claims for amounts over $10,000. *Melvin v. Laird,* 365 F.Supp. at 517; *Carter v. Seamans,* 411 F.2d at 771–72. Respect for this principle requires deference to the Court of Claims for actions essentially for money in excess of $10,000 even where jurisdiction over part of the action may lie under another provision. *See Carter v. Seamans,* 411 F.2d at 775. The division of responsibility between the District Court and the Court of Claims has traditionally entailed separate suits for equitable relief and money damages, *see Melvin v. Laird,* 365 F.Supp. at 516–18; this division, and its consequent imposition on plaintiffs, has only partially been alleviated by amendment to the Tucker Act. It reflects the fundamental Congressional purpose to employ the expertise of the Court of Claims in all cases in which the damages sought against the United States exceed $10,000. *See Glidden v. Zdanok,* 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962).

Plaintiffs' suggestion that they not allege any jurisdictional amount until after the Court has valued all the claims would frustrate the Congressional purpose of limiting the jurisdiction of the District Court. The court has faced a similar suggestion in *Larsen v. Hoffman, supra,* in which plaintiffs sought to deduct potential setoffs and counterclaims from the amount they were claiming in order to remain within the jurisdictional limits of the District Court. In a careful and substantial opinion, Judge Corcoran held that the traditional rules for pleading of jurisdictional amounts in controversy applied to actions under the Tucker Act. 444 F.Supp. at 254. *Larsen* is controlling here. Like the situation faced by Judge Corcoran, the plaintiffs' proposal here would require jurisdictional determinations to await the outcome of the trial on the merits. This result is plainly not contemplated by the statute, which refers to the amounts of "claims" against the United States. 28 U.S.C. § 1346(a)(2).

In order to permit the plaintiffs the widest latitude in deciding how to proceed, the Court will delay entry of any final order transferring any claims for a period of 60 days. During this time, plaintiffs may elect either to have the entire action transferred to the Court of Claims pursuant to 28 U.S.C. § 1406, or to bifurcate the class, with this Court retaining jurisdiction over only those claims not greater than $10,000. Plaintiffs may, of course, elect to pursue the entire action in this Court by waiving all claims in excess of $10,000. *See Vander-Molen v. Stetson,* 571 F.2d at 619 n.2. If the plaintiffs elect to pursue all or some of their claims in this Court under the foregoing conditions, the Court will grant leave for plaintiffs to file a Second Amended Complaint alleging jurisdiction under the Tucker Act and pleading an amount claimed. *See* Rule 8(a), Fed.R.Civ.P. Without objection from the government, which has acknowledged that this is an action essentially against the United States, *see Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), the Court will also grant leave to add the United States as a party defendant.

An appropriate order accompanies this Memorandum.

### ORDER

The Court has considered plaintiffs' motions to alter or amend the judgment and to amend the complaint, and defendants' opposition thereto; and defendants' motion to dismiss or, in the alternative, for transfer to the Court of Claims, and plaintiffs' opposition thereto. For the reasons set forth in the accompanying memorandum, it is this 25th day of April, 1980, hereby

ORDERED: That plaintiffs' motion to alter or amend the judgment is DENIED; and it is

FURTHER ORDERED: That the plaintiffs shall have 60 days from the date of

this Order in which to elect whether to proceed in this Court with those claims against the United States not in excess of $10,000 or to transfer all claims to the Court of Claims; and it is

FURTHER ORDERED: That plaintiffs shall file no later than 60 days from the date of this Order a notice setting forth the manner in which they elect to proceed; and it is

FURTHER ORDERED: That if plaintiffs elect to proceed in this Court leave is GRANTED to amend the Amended Complaint to add the United States as a defendant and to allege jurisdiction pursuant to 28 U.S.C. § 1346(a)(2), provided that plaintiffs also allege an amount claimed by each individual from the United States. Nothing in this Order shall be construed as limiting the jurisdiction of this Court to effectuate the Declaratory Judgment entered February 15, 1980, or otherwise to protect its jurisdiction; and it is

FURTHER ORDERED: That defendants' motion to dismiss or, in the alternative, to transfer to the Court of Claims is DENIED without prejudice.