586 F.2d 675
 Albert Edward GLINES, Appellee,
v.
James L. WADE, Commander 349th Material Airlift Wing, Major
General Gonge, Commander 22nd Air Force, John L.
McLucas, Secretary of the Air Force,
James Schlesinger, Secretary
of Defense, Appellants.
 No. 76-1412.
 United States Court of Appeals,
Ninth Circuit.
 Oct. 5, 1978.
As Amended Nov. 22, 1978.
 
 John F. Cordes (argued), of Dept. of Justice, Washington, D.C., for appellants.
 Melvin K. Dayley, Oakland, Cal., David M. Cobin (argued), St. Paul, Minn., for appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before GOODWIN and HUG, Circuit Judges, and PALMIERI*, District Judge.
 GOODWIN, Circuit Judge:
 
 
 1
 The government appeals a judgment ordering reinstatement in the Air Force, back pay, and declaratory relief which struck down as unconstitutional certain Air Force regulations.
 
 
 2
 We affirm the nonmonetary parts of the judgment but vacate that portion awarding back pay as beyond the jurisdiction of the district court to grant.
 
 
 3
 Albert Glines was a Captain in the Air Force Reserves. While on active duty, he took training as a navigator instructor. Air Force standards describing maximum hair length offended him. To show his opposition, he drafted essentially identical petitions to several members of Congress and to the Secretary of Defense.[1] He intended to seek signatures to the petitions at his home station, Travis Air Force Base. Captain Glines learned, however, that Air Force Regulation 30-1(9) prohibits "the public solicitation or collection of signatures on a petition by any person within an Air Force facility * * * unless first authorized by the commander" and that AFR 35-15(3)(a)(1) prohibits the distribution of "any printed or written material * * * within any Air Force installation without permission of the Commander or his designee."[2] Because of these regulations, Captain Glines first circulated the petitions off base. Later he decided to ignore the regulations and to circulate the petitions on base. He also shaved his head.
 
 
 4
 The record does not show whether Captain Glines actually circulated the petitions on the Travis reservation. In April 1974, during a stopover at Guam, he gave copies of the petitions to a Sergeant Wolf. Sergeant Wolf gained eight signatures on Guam before base authorities learned of his activities, stopped them, and helped the signatories learn "the error of their ways". The Air Force immediately removed Captain Glines from active duty and soon afterwards reassigned him to the standby reserves. As a "standby" he was unable to complete his navigator instructor training and lost other benefits.
 
 
 5
 Captain Glines brought this action alleging that the regulation of petitions violated 10 U.S.C. § 1034 and the First Amendment. He sought reinstatement and back pay. The district court declared the regulations void for statutory and constitutional infirmities, ordered Captain Glines reinstated in the active reserve, and awarded him more than $22,000 in back pay. Glines v. Wade, 401 F.Supp. 127 (N.D.Cal.1975). The government appeal challenges the judgment on a number of grounds.
 
 I. Exhaustion of Administrative Remedies
 
 6
 The government first argues that the district court should have required Captain Glines to seek relief from the Air Force Board for the Correction of Military Records (AFBCMR) before bringing this action. This point is not well taken.
 
 
 7
 Captain Glines' claim depends on constitutional and statutory interpretations which are beyond the scope of the jurisdiction of the AFBCMR. While the government treats the case as simply a claim for reinstatement and back pay, Captain Glines also sought and received a declaratory judgment invalidating the challenged regulations. Without this judgment he would remain subject to the regulations after his reinstatement. "Resolving a claim founded solely upon a constitutional right is singularly suited to a judicial forum and clearly inappropriate to an administrative board." Downen v. Warner, 481 F.2d 642, 643 (9th Cir. 1973).
 
 
 8
 The AFBCMR was never intended by Congress to resolve the essentially legal issues involved in this case. Like other BCMRs, it is a clemency-oriented body, with authority to "correct an error or remove an injustice," 10 U.S.C. § 1552(a), not to declare the law. The Board simply substitutes for private congressional bills its remedy for individual grievances. Congress stopped accepting such private bills when it authorized the BCMRs. 2 U.S.C. § 190g. BCMRs are not necessarily legally trained. They get their legal advice from the Judge Advocate General's office. See, e. g., Flute v. United States, 535 F.2d 624, 627-28, 210 Ct.Cl. 34 (1976). The AFBCMR has no authority to declare the challenged regulations invalid. Even if it gave Captain Glines all the redress within its power, it would not be able to protect him from further attempts by the Air Force to enforce its regulations. Only a court can do so.[3]
 
 
 9
 We recently held that a district court may require exhaustion to a BCMR, in its discretion, after balancing the relevant factors. Montgomery v. Rumsfeld, 572 F.2d 250, 252-54 (9th Cir. 1978). The district court, of course, did not have the opportunity to do the balancing we suggested in Montgomery. However, the district court did not in this case require exhaustion, and, for the reasons indicated, we agree with the district court.[4]II. Statutory Claim
 
 
 10
 10 U.S.C. § 1034 prohibits restrictions on communications between members of the military and members of Congress unless the communication is unlawful or the restrictions are necessary to the national security.[5] In Allen v. Monger, 583 F.2d 438 (9th Cir. 1978), we struck down under § 1034 Naval regulations requiring prior approval for the circulation of petitions on a ship at port in the United States. We held that the Navy's system of prior restraints was not necessary to the national security in the factual situation described in the Allen case.
 
 
 11
 The District of Columbia Circuit has upheld similar restrictions when applied to an actual combat zone. Carlson v. Schlesinger, 167 U.S.App.D.C. 325, 511 F.2d 1327 (1975). On the other hand, the same court has struck down regulations inconsistent with § 1034 when they were applied to a combat-ready base in Japan. Huff v. Secretary of the Navy, 188 U.S.App.D.C. 26, 575 F.2d 907 (1978). The base commander filed an affidavit emphasizing the combat-ready nature of the base, but the majority found his argument unpersuasive.
 
 
 12
 The record now before us does not indicate the precise nature of the base on Guam where Captain Glines handed Sergeant Wolf the petitions. The government has not shown that Guam was more sensitive or that petitioning on that base was inherently more disruptive than was true of the base involved in Huff. While prior restraints on petitioning may promote some military objectives, the government has not shown that such restraints are actually necessary to the national security outside of a combat zone.
 
 
 13
 Despite proper deference to the military's ability to judge the impact of unauthorized petitioning on discipline, we do not believe the government has shown that the bad effects of petitioning would endanger the national security in these circumstances.[6] This is a determination we must make independently, for Congress in adopting § 1034 has consciously restricted military command discretion on this point.
 
 
 14
 Only if we determine that the petitions are a threat to national security can we uphold the military restriction. "(W)e do not think that the national security can be said to require that the objective of military discipline be pursued to the exclusion of all other interests. If this were the case, then § 1034 would be a nullity, for restrictions on petitioning activity, as on other types of speech, can always be said to decrease the possibility of lapses of military discipline." Huff v. Secretary of the Navy, 188 U.S.App.D.C. at 33, 575 F.2d at 914. Congress adopted § 1034 because it preferred free communication with military personnel to absolute discipline in the military; AFR 30-1(9) and 35-15(3)(a) improperly ignore the Congressional policy.[7]
 
 III. Constitutional Claims
 
 15
 Read literally, § 1034 protects only the four petitions addressed to members of Congress. One petition, which was essentially identical to the others, was addressed to the Secretary of Defense. This petition requires us to decide whether the First Amendment also protects Glines' activities.
 
 
 16
 It is clear that these regulations would be unconstitutional on their face if they applied to the public at large. Prior restraints on speech face a heavy burden of justification, which they are seldom able to meet. New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). First Amendment rights do not expire upon enlistment in a military arm, although the needs of the service may modify the extent of the application of these rights. "Speech that is protected in the civil population may nonetheless undermine the effectiveness of response to command. If it does, it is constitutionally unprotected." Parker v. Levy, 417 U.S. 733, 758-59, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), quoting, at 759, 94 S.Ct. at 2563, United States v. Gray, 20 U.S.C.M.A. 63 (1970). The issue in Parker v. Levy was whether various Articles of the Uniform Code of Military Justice were too vague to support a conviction for statements urging enlisted men to disobey orders. The Supreme Court held that they were not. There was no prior restraint involved.
 
 
 17
 The First Amendment protects this country's basic commitment to open and vigorous debate. We have assumed as a nation that free discussion will be likely to lead to the right decisions, that, as Justice Brandeis said, when falsehoods and fallacies abound, "the remedy to be applied is more speech, not enforced silence." Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). The First Amendment reflects a conscious choice to prefer citizen autonomy to conformity.
 
 
 18
 A requirement for precirculation clearance is obviously a prior restraint on speech, and prior restraints have the heaviest burden of justification under the First Amendment.
 
 
 19
 ". . . (P)rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights * * *.
 
 
 20
 "If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it at least for the time."
 
 
 21
 Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 559, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976).
 
 
 22
 The military need for obedience and discipline may justify certain restrictions on speech that would be impermissible in civilian life. As Parker v. Levy, supra, shows, speech that poses a genuine threat of undermining obedience to orders may subject the speaker to appropriate punishment.[8] If Glines' activities had violated regulations that focused on these considerations, the Air Force's response might be acceptable. Punishment after the fact for genuinely disruptive petitions, limitation of circulation to certain areas and to off-duty periods, and protection from pressure by superiors who are seeking signatures would adequately protect the government's interest.[9]
 
 
 23
 The Supreme Court insists on less restrictive alternatives to prior restraint when they are available, and it critically examines whether the restraint will have its intended effect. Nebraska Press Ass'n v. Stuart, 427 U.S. at 563-70, 96 S.Ct. 2791. Less restrictive alternatives are available.
 
 
 24
 We have emphasized that these regulations are prior restraints on speech. The government suggests that they are, instead, merely time, place, and manner restrictions. This is how the District of Columbia Circuit treated the same regulations as applied in a combat zone. Carlson v. Schlesinger, supra. A combat zone, of course, is only a small part of the total military deployment. Restrictions there do not necessarily support restrictions throughout all other military reservations. Indeed, to treat these regulations as time, place, and manner restrictions necessarily implies that there must be other places within the military jurisdiction where petitioning by military personnel is permitted. Assuming that we would agree with the majority in Carlson, therefore, we do not think Carlson compels us to give combat-zone status to the regulations when applied here.
 
 
 25
 The Supreme Court also treated similar restrictions applied to civilian political campaigning as time, place, and manner restrictions in Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). The question there was whether uninvited civilians could come on the base, where they had no clear right to be, for political purposes. That is quite a different question from that of direct restraints upon the exercise by military personnel of the right of free speech.
 
 
 26
 It may be argued that the challenged regulations cover activity, such as petitioning in a combat zone, on which the military may legitimately impose prior restraints. The regulations are nevertheless void because they are overbroad. Since they affect Glines' activities, he has standing to challenge their overbreadth. Parker v. Levy, 417 U.S. at 760-61, 94 S.Ct. 2547; Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).
 
 
 27
 Overbreadth appears from a cursory reading. The regulations deal with protected expression and could cover virtually all controversial written material. The commanding officer makes the decisions, and his views are centered on his command, not on abstract First Amendment values. The regulations, indeed, allow him to prohibit distribution partly because "the material is critical of Government policies or officials." AFT 35-15(a)(4). Glines' case itself shows that commanding officers may be unsympathetic to even the most innocuous exercise of First Amendment rights. Finally, the restrictions exceed anything essential to the government's interests. United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1967). The regulations are valid, if at all, only in the limited setting of a combat zone. Their overbreadth is substantial.[10] Broadrick v. Oklahoma, 413 U.S. at 615-16, 93 S.Ct. 2908.
 
 IV. Jurisdiction to Award Damages
 
 28
 For the reasons we have already given, we hold that the district court was correct in declaring the regulations void, enjoining their enforcement, and ordering Glines reinstated in a status that is consistent with his status before he was relieved from active duty. However, it lacked jurisdiction to award him back pay, and we must vacate that part of its judgment.
 
 
 29
 Under the Tucker Act, a district court has jurisdiction to award damages against the United States to a maximum of $10,000. All other monetary claims must go to the Court of Claims. 28 U.S.C. § 1343(a)(2). There is no such restriction on actions seeking nonmonetary relief or actions claiming that a government official acted in violation of the Constitution or of statutory authority. The reason is that in these situations Congress has either waived sovereign immunity or the doctrine does not apply. 5 U.S.C. § 702; Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 689-91, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); Hill v. United States, 571 F.2d 1098, 1102 (9th Cir. 1978); 14 Wright, Miller, and Cooper, Federal Practice and Procedure § 3655 (Supp.1977). These doctrines justify the district court's judgment except for its award of back pay. Since the Court of Claims is without jurisdiction to grant general declaratory or equitable relief, the district court had no reason to defer to it. 28 U.S.C. § 1491; United States v. Testan, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); United States v. King, 395 U.S. 1, 3, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969).
 
 
 30
 Congress has waived sovereign immunity when damages will be paid from the public treasury only if the claimant sues under the Tucker Act in the proper court. Glines did not plead Tucker Act jurisdiction, and in any event the district court awarded him an amount in excess of its Tucker Act authority. While a district court may give damages as an incident to a declaratory judgment, it may do so only if such relief would otherwise be within its jurisdiction. 28 U.S.C. §§ 2201, 2202; United States v. King,395 U.S. at 3-4, 89 S.Ct. 1501.
 
 
 31
 Glines argues that sovereign immunity is inapplicable, and the district court therefore had jurisdiction under 28 U.S.C. § 1331, because he alleged that the regulations are unconstitutional and in violation of a statute. He cites Larson v. Domestic and Foreign Commerce Corp., supra, in support of his position. However, he does not come within the Larson exception to sovereign immunity. The Supreme Court specifically noted in Larson that a suit would still fail as against the sovereign if relief would require affirmative action or the disposition of sovereign property. 337 U.S. at 691 n. 11, 69 S.Ct. 1457. Glines' action is of this nature. His relief must come from the Court of Claims. The government, of course, could not relitigate in that forum any issues which have been decided against it here.
 
 
 32
 We affirm the judgment of the district court except for its award of back pay. We vacate that award and remand it to the district court with instructions either to dismiss the claim without prejudice to another action in the Court of Claims or to transfer that part of the case to the Court of Claims directly. Sherar v. Harless, 561 F.2d 791, 794 (9th Cir. 1977).
 
 
 33
 Affirmed in part: vacated and remanded in part.
 
 
 
 *
 The Honorable Edmund L. Palmieri, United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 The petitions were identical except for the names of the person to whom they were directed and of the others to whom petitions were also being sent. That to the Secretary of Defense read:
 "Dear Secretary of Defense:
 "We, the undersigned, all American citizens serving in the Armed Services of our nation, request your assistance in changing the grooming standards of the United States Air Force.
 "We feel that the present regulations on grooming have caused more racial tension, decrease in morale and retention, and loss of respect for authorities than any other official Air Force policy.
 "We are similarly petitioning Senator Cranston, Senator Tunney, Senator Jackson, and Congressman Moss in the hope that one of our elected or appointed officials will help correct this problem."
 
 
 [2]
 AFR 30-1(9) reads:
 "9. Right of Petition. Members of the Air Force, their dependents and civilian employees have the right, in common with all other citizens, to petition the President, the Congress or other public officials. However, the public solicitation or collection of signatures on a petition by any person within an Air Force facility or by a member when in uniform or when in a foreign country is prohibited unless first authorized by the commander."
 AFR 35-15(3)(a) reads:
 "3. Specific Guidelines and Prohibited Activities :
 a. Possession and Distribution of Written or Printed Materials :
 (1) No member of the Air Force will distribute or post any printed or written material other than publications of an official governmental agency or base regulated activity within any Air Force installation without permission of the commander or his designee. A copy of the material with a proposed plan or method of distribution or posting will be submitted when permission is requested. Distribution of publications and other materials through the United States mail or through official outlets, such as military libraries and exchanges, may not be prohibited under this regulation.
 (2) When prior approval for distribution or posting is required, the commander will determine if a clear danger to the loyalty, discipline, or morale of members of the Armed Forces, or material interference with the accomplishment of a military mission, would result. If such a determination is made, distribution or posting will be prohibited and HQ USAF (SAFOI) will be notified of the circumstances.
 (3) Mere possession of materials unauthorized for distribution or posting may not be prohibited unless otherwise unlawful. However, such material may be impounded if a member of the Armed Forces distributes or posts or attempts to distribute or post such material within the installation. Impounded materials will be returned to the owner when departing the installation unless determined to be evidence of a crime.
 (4) Distribution or posting may not be prohibited solely on the ground that the material is critical of Government policies or officials.
 (5) In general, installation commanders should encourage and promote the availability to service personnel of books, periodicals, and other media which present a wide range of viewpoints on public issues."
 
 
 [3]
 Schlesinger v. Councilman, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1974), which the government cites, involved a district court's authority to enjoin a court-martial allegedly acting in excess of its jurisdiction. A court-martial is, of course, a legally oriented body, as are the military appeals courts. They are competent to decide their own jurisdiction, and they do not take their legal advice directly from the Judge Advocate General's office
 
 
 [4]
 This court recently outlined in substance the following test of reviewability in a case brought by an enlisted member of an armed branch who objected to his duty assignment:
 (1) The plaintiff must allege the denial of a constitutional right and the exhaustion of his military remedies.
 (2) If the plaintiff satisfies step (1) he must then show that judicial review is warranted upon a proper balancing of the following considerations:
 (a) the nature and strength of his claim;
 (b) the extent of his potential injury if review is denied;
 (c) the degree of civilian interference with the military mission if the court grants review; and
 (d) the extent to which the decision to be reviewed was based upon military expertise.
 Schlanger v. United States, 586 F.2d 667 (9th Cir., Sept. 11, 1978).
 In the case at bar, Glines satisfies all the tests set forth in Schlanger, supra, even though, as the factual situations in the two cases reveal, the cases have little but the military uniform in common.
 
 
 [5]
 10 U.S.C. § 1034 reads:
 "No person may restrict any member of an armed force in communicating with a member of Congress, unless the communication is unlawful or violates a regulation necessary to the security of the United States."
 
 
 [6]
 Glines was disciplined for violating the regulations requiring prior approval. The Air Force does not contend that he did anything else that would have subjected him to discipline
 
 
 [7]
 This discussion assumes that military discipline and free speech are necessarily incompatible. There is a strong argument to the contrary. Donald N. Zillman, Free Speech and Military Command, 1977 Utah L.Rev. 423, 433-34
 
 
 [8]
 We do not believe that vocal disagreement with public policy by itself necessarily leads to disobedience to orders. "I think, and any society which truly believes in a First Amendment must assume, that soldiers like other citizens can disagree with governmental policy and yet still realize that they must follow the legal requisites of that policy, including military service, until the policy is changed by democratic means." Carlson v. Schlesinger, 167 U.S.App.D.C. 325, 335, 511 F.2d 1327, 1337 (1975) (Bazelon, J., dissenting)
 
 
 [9]
 See the limitations the district court adopted, and we approved on appeal, in Allen v. Monger, 404 F.Supp. 1081, 1090 (N.D.Cal.1975), Aff'd supra
 
 
 [10]
 The majority in Carlson v. Schlesinger, 167 U.S.App.D.C. at 331-332, 511 F.2d at 1333-34, also questioned the regulations' breadth but stopped short of a finding of overbreadth. Judge Bazelon, dissenting, viewed them as invalid, as applied, and overbroad. 167 U.S.App.D.C. at 333, 511 F.2d at 1335