Tracy THORNE, Plaintiff,

v.

**UNITED STATES DEPARTMENT OF DEFENSE et al., Defendants.**

**Civil Action No. 95–369–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

March 4, 1996.

Patrick W. Lee, Luther Zeigler, Amy J. Mauser, Kathryn D. Kirmayer, Mark A. Behrens, Mary Bowman Hauck, Christopher M. Farris, Crowell & Moring, Washington, D.C., for plaintiff.

Janet Reno, United States Attorney General, Frank W. Hunger, Assistant Attorney General, Helen F. Fahey, United States Attorney, Dennis E. Szybala, Assistant United States Attorney, Alexandria, Virginia, David J. Anderson, Vincent M. Garvey, Sylvia T. Kaser, Department of Justice, Washington, D.C. (Hack Wigman, United States Department of Defense, Office of the General Counsel, Washington, D.C., Cdr. Robert P. Monahan, Lt. Susan C. Stewart, U.S. Department of the Navy, Office of the Judge Advocate General, Arlington, Virginia, of counsel), for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This case presents the question whether the government's "Don't Ask, Don't Tell" statutory and regulatory plan with respect to military service by homosexuals violates the First Amendment.[1]

### I

By all accounts, had Lieutenant Thorne not publicly announced that he was a homosexual, he would be an exemplary Naval Officer. In May of 1989, Thorne began his military career by entering Aviation Officer Candidate School. He quickly excelled, receiving Outstanding Achievement Awards for his academic excellence and his physical training. He was first in his class in each of the basic, intermediate, and advanced portions of his training, was placed on the Commodore's List for academic and flight achievement, and was named top student flight officer.

After completing his tenure at AOCS and earning the designation of Naval Flight Officer, Thorne spent thirteen months training as a bombardier/navigator in the A–6 Intruder. He then joined Attack Squadron VA–65 at the Naval Air Station in Oceana, Virginia, where he continued to excel, impressing his commanding officers with his leadership and aviation skills.

In the spring of 1992, Thorne decided to announce publicly that he was a homosexual. On May 19, 1992 he sent a letter to his commanding officer in which he revealed his intention to disclose his sexual orientation. That night, he appeared on national television on the ABC news program "Nightline" and told the viewing audience that he was gay. As a result, on June 9 Thorne received a Notification of a Board of Inquiry Proposed Action to separate Thorne from the service

---

1. A number of district courts have considered this question, reaching different conclusions on a variety of grounds. *Compare Richenberg v. Perry,* 909 F.Supp. 1303 (D.Neb.1995) (upholding plan against First Amendment challenge) *and Selland v. Perry,* 905 F.Supp. 260 (D.Md.1995) (same) *and Thomasson v. Perry,* 895 F.Supp. 820 (E.D.Va.1995) (same) *and Philips v. Perry,* 883 F.Supp. 539 (W.D.Wash.1995) (same) *with Able*

*v. United States,* 880 F.Supp. 968 (E.D.N.Y.1995) (striking plan down as violative of the First Amendment). None proceeds along quite the same path as that followed in this memorandum opinion. Also, no circuit court has yet weighed in on the issue, although the *Able* case is on appeal in the Second Circuit and the Fourth Circuit has heard the *Thomasson* case *en banc.*

because of his statements on television, in accordance with the military's policy regarding service by homosexuals in effect at the time. Under that policy, a member of the armed services would be separated from the armed services if a finding was made that the member (1) engaged in homosexual acts, unless the member proved that the conduct was an aberration unlikely to recur and that his continued service was in the best interest of the military; (2) stated that he was a homosexual or bisexual unless a further finding was made that the member was not a homosexual or bisexual; or (3) married or attempted to marry a person of the same sex unless a further finding was made that the member was not a homosexual. At the Administrative Show Cause Hearing, the Board of Inquiry unanimously recommended that Thorne be discharged.

While Thorne's discharge proceedings were pending, President Clinton directed the Secretary of Defense at the time to review the Department of Defense policy concerning gays in the military. On February 3, 1993, the Secretary issued an interim policy that placed gay and lesbian service members in the process of being discharged because of their sexual orientation on standby inactive reserve status, pending the promulgation of a new policy. Accordingly, the Attorney General suspended Thorne's discharge on April 26, 1993, but nonetheless removed Thorne from active duty and placed him on inactive reserve status.

Thereafter, on July 19, 1993, the Secretary announced a new policy concerning homosexuals in the military. This policy, a precursor to the plan at issue here, allowed homosexuals to serve provided they did not engage in homosexual conduct. Implementing regulations were scheduled to be issued by October 1, 1993. When that date passed without the appearance of the new regulations, the Navy Office of Personnel indicated its intent to return Thorne to active duty. The Secretary of the Navy rescinded that order on November 3, and two weeks later Thorne filed suit in the District Court for the District of Columbia alleging unlawful discharge.

Shortly thereafter, Congress formally enacted the policy contained in the July 19 directive as § 571 of the National Defense Authorization Act for Fiscal Year 1994, Pub.L. No. 103–160, 107 Stat. 1670–73 (codified at 10 U.S.C. § 654). President Clinton signed the policy into law on November 30, 1993. Under this new legislation, popularly known as the "Don't Ask, Don't Tell" plan, a service member will be separated from the armed forces if "the member has stated that he or she is a homosexual or bisexual, or words to that effect, unless there is a further finding, made and approved in accordance with procedures set forth in the regulations, that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in." 10 U.S.C. § 654(b)(2).[2] Congress also directed the Secretary of Defense to issue regulations implementing the new statute. In light of this new legislation, the Assistant Secretary of Defense announced on January 6, 1994 that service members in the process of being discharged on the basis of their sexual orientation, including Thorne, would be reinstated and then reconsidered for discharge under the "Don't Ask, Don't Tell" legislation and its

**2.** The statute also calls for the separation of a service member in the following circumstances:

(1) [T]he member has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts unless there are further findings, made and approved in accordance with procedures set forth in [the] regulations, that the member has demonstrated that—
(A) such conduct is a departure from the member's usual and customary behavior;
(B) such conduct, under all the circumstances, is unlikely to recur;

(C) such conduct was not accomplished by use of force, coercion, or intimidation;
(D) under the particular circumstances of the case, the member's continued presence in the armed forces is consistent with the interests of the armed forces in proper discipline, good order, and morale; and
(E) the member does not have a propensity to engage in homosexual acts; [or]
(3) [T]he member has married or attempted to marry a person known to be of the same biological sex.
10 U.S.C. § 654(b)(1) & (3). Those aspects of the statutory plan are not at issue in this case.

implementing regulations. Given this, the parties in the District of Columbia suit entered into a stipulation that Thorne would be returned to active duty and that the Navy could again seek to discharge him under the soon-to-be-promulgated regulations, and the suit was voluntarily dismissed. Pursuant to this agreement, Thorne returned to active duty on January 31, 1994 and was assigned to Air–714, Information Systems. Once again, he proved to be an outstanding officer, performing his duties in exemplary fashion. Air–714's commanding officer ranked Thorne Number 1 in the command and recommended Thorne for early promotion, stating that his "accomplishments [were] unparalleled" and that his "leadership vision embraces the very qualities most sought after throughout the fleet."

Pursuant to Congress's direction, the Department of Defense promulgated regulations implementing the policy embodied in 10 U.S.C. § 654 in DoD Directives 1332.14 and 1332.30.[3] Thereafter, on March 29, 1994, Thorne was again notified of an Administrative Show Cause Hearing to be held by a Naval Board of Inquiry on July 11, 1994. At that hearing, the Navy presented no live testimony, but offered several documents, including Thorne's letter of May 19, 1992 to his commanding officer, a transcript of the Nightline broadcast, and statements of two of his squadron mates. Thorne called three witnesses. Commander Luigart, Thorne's commanding officer at the time, testified to Thorne's outstanding service and qualifications. Dr. Lawrence Korb, Director for the Center for Public Policy Education at the Brookings Institute and former Assistant Secretary of Defense, testified that a statement of one's sexual orientation does not indicate a propensity to engage in homosexual conduct and that the asserted policy justifications for the new policy would not be compromised by allowing Thorne to remain in the Navy. Finally, Lieutenant Sutko, a heterosexual, testified that he had known Thorne since October 1989, that he had shared a townhouse with him for a year, that he had never known Thorne to behave in an

inappropriate manner, and that he would have no concerns about flying with or sharing close quarters with Thorne. Thorne also offered numerous statements and reports that concluded that the "Don't Ask, Don't Tell" policy, as embodied in § 654, was based on irrational fears and prejudices.

On the record presented, the Board of Inquiry unanimously found that Thorne's statement that he was a homosexual gave rise to a rebuttable presumption that he had a "propensity" to engage in prohibited conduct and that Thorne had failed to rebut that presumption. Accordingly, the Board recommended that Thorne be honorably discharged. That recommendation was transmitted to the Secretary of the Navy, who, on March 7, 1995, accepted the Board's findings and ordered Thorne's discharge. Thorne was discharged on March 9, 1995 and filed this suit on the same day. The matter is now before the Court on the parties' cross-motions for summary judgment.

**II**

As a threshold matter, the government contends that the Court is without jurisdiction over this case because Thorne has failed to exhaust his administrative remedies. In this regard, Thorne admits he did not present his case to the Navy Board for Correction of Military Records ("NBCMR").

To be sure, litigants are generally required to exhaust all administrative remedies before filing suit in federal court. *See Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 51–52, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1983). Yet, "[t]he doctrine is not an absolute bar to judicial consideration and where justification for invoking the doctrine is absent, application is unwarranted." *Downen v. Warner*, 481 F.2d 642, 643 (9th Cir. 1973). Specifically, exhaustion is excused "if the [administrative] remedies do not provide an opportunity for adequate relief ... or if substantial constitutional questions are raised." *Muhammad v. Secretary of the Army*, 770 F.2d 1494, 1495 (9th Cir.1985);

---

3. Directive 1332.14, which applies to enlisted personnel, and Directive 1332.30, which applies to officers, are substantially similar. Because Thorne, as an officer, was governed by Directive 1332.30, only that Directive will be referred to in the course of this opinion.

see also *Von Hoffburg v. Alexander*, 615 F.2d 633, 638 (5th Cir.1980); *Downen*, 481 F.2d at 643 (1973); *Walmer v. U.S. Dep't of Defense*, 835 F.Supp. 1307, 1311 (D.Kan.1993). Thorne's claim fits this description. First, his claim depends entirely on constitutional questions, and "[r]esolving a claim founded solely upon a constitutional right is singularly suited to a judicial forum and clearly inappropriate to an administrative board." *Glines v. Wade*, 586 F.2d 675, 678 (9th Cir. 1978), *rev'd on other grounds sub nom.*, *Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980); *see also Downen*, 481 F.2d at 643 (holding that petitioner was not required to raise First Amendment claim to the Air Force Board for the Correction of Military Records). Second, it is not clear that the NBCMR even has the authority to strike down a military regulation as unconstitutional on its face. *See Glines*, 586 F.2d at 678 ("The [Air Force BCMR] was never intended by Congress to resolve the essentially legal issues involved in this case."); *Walmer*, 835 F.Supp. at 1310 (Government "admitted in oral argument that the [Army BCMR] does not have the authority, except on an as-applied basis, to hold a military policy unconstitutional, and that in fact, it is impermissible for the [Army BCMR] to strike down a military policy on its face."). Accordingly, the exhaustion-of-remedies doctrine is inapplicable here and the matter is therefore properly before the Court.

## III

### A. Conduct or Speech: The Statute

Thorne contends that the "Don't Ask, Don't Tell" plan, both on its face and in the manner in which it is applied, violates the Free Speech Clause of the First Amendment. The government contends that the plan is directed at conduct not speech and therefore does not impinge on Thorne's First Amendment rights. The crucial first step in the analysis, therefore, is to determine whether the plan merely regulates conduct, in which case the First Amendment is not implicated, or whether the plan is in fact a restriction on speech, in which case it must be subjected to the appropriate degree of judicial scrutiny.

The government's position is that the statement "I am gay" merely gives rise to a presumption that the person engages in or has a propensity to engage in certain forms of conduct that are prohibited in the military. The service member then has the opportunity to rebut that presumption by convincing a panel of military officers that he in fact does not engage in, nor does he have a propensity to engage in, the prohibited conduct. The speech to the effect that "I am gay", according to the government, is only relevant insofar as it is evidence of that person's conduct.

Thorne responds that the presumption, both on the face of the "Don't Ask, Don't Tell" statute and accompanying regulations and in the manner in which the statute and regulations are applied, is an irrebuttable one. If he is correct in either regard, then the statutory and regulatory plan in essence dismisses service members who say they are gay, which is plainly a regulation of speech, not conduct. If, however, the presumption is rebuttable, then the plan may properly be deemed to be a regulation of conduct rather than of speech. It is therefore necessary to consider to what extent the presumption is a rebuttable one in order to decide whether the statute is a restriction on speech.

■ Although Thorne's attack focuses on the implementing regulations, it is useful at the outset to examine the statute, which provides, in pertinent part, that a service member shall be separated from service if there is a finding made that "the member has stated that he or she is a homosexual … unless there is a further finding … that the member has demonstrated that he or she is not a person who … has a *propensity* to engage in … homosexual acts." 10 U.S.C. § 654(b)(2) (emphasis added).[4] Closely read, the statute is a tautology and hence the rebuttable presumption it purports to express is illusory, for it cannot be rebutted short of the declarant recanting the original

---

**4.** The statute defines "homosexual act" as "(A) any bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires; and (B) any bodily contact which a reasonable person would understand to demonstrate a propensity or intent to engage in an act described in subparagraph (A)." 10 U.S.C. § 654(f)(3).

statement declaring his or her homosexuality. This follows from the plain meaning of the statute's operative terms, namely "homosexual" and "propensity." "Propensity" is defined as a "[d]isposition or inclination to some action, course of action, habit, etc." *The Oxford English Dictionary* 637 (2d ed. 1989); *see also Webster's II: New Riverside University Dictionary* 943 (1984) ("An inherent inclination: TENDENCY"); *American Heritage College Dictionary* 1096 (3d ed. 1993) ("An innate inclination; tendency"). And in common parlance, a person who states he or she is gay or homosexual is declaring that he or she prefers persons of the same gender in sexual matter, that is that he or she has a sexual "inclination or

propensity" for persons of the same gender. Indeed, "homosexual" is even defined in the authoritative OED as "[a] person who has a sexual propensity for his or her own sex." *The Oxford English Dictionary* 345 (2d ed. 1989). Given these definitions, the statute says, tautologically, nothing more than this: a service member who declares his or her homosexuality will be severed from the service unless the member convinces the fact finder that he or she is not a homosexual.[5] In other words, the presumption is irrebuttable absent a recantation.[6] So understood, the statute, on its face, is plainly aimed at speech, not conduct, and is therefore equally plainly a restriction on speech.[7]

---

5. This tautology was recognized during the legislative debates preceding the statute's enactment. As Representative Roscoe G. Bartlett explained:

> [A service member] has to prove that he did not have a propensity. And I looked up propensity in the dictionary, and unless you have a different dictionary, if he doesn't have a propensity, he is not a homosexual. So if he says he is a homosexual, but now to clear himself he has to prove that he, in fact, lied to you about that, he is not homosexual; that is what propensity says.

*Assessment of the Plan to Lift the Ban on Homosexuals in the Military: Hearings on H.A.S.C. No. 103–19 Before the Military Forces and Personnel Subcommittee of the House Committee on Armed Services,* 103d Cong., 1st Sess. 200 (1993).

6. The legislative history accompanying the passage of the "Don't Ask, Don't Tell" plan embodied in § 654 supports the conclusion that on the face of the statute only a recantation rebuts the presumption. For example, the Report of the Senate Committee on Armed Services states that:

> The committee intends that this provision be interpreted in accordance with the following points . . .
>
> . . . .
>
> Second, a member cannot rebut the presumption simply through a promise to adhere to military standards of conduct in the future; nor can the member rebut the presumption by a statement to the effect that he or she has a propensity towards homosexuality but has not acted on it.
>
> Third, if the member in rebuttal offers evidence to the effect that he or she does not engage in homosexual acts or have a propensity or intent to do so that does not shift the burden to the Government. Because the burden remains on the service member throughout the proceeding, the member bears the burden of persuading the fact finder by a preponderance of the evidence that the rebuttal is

more credible than the original statement (*e.g., by proving that the original statement was made in jest*).

S.Rep. No. 112, 103d Cong., 1st Sess. 294 (1993) (emphasis added).

And during the Senate hearings on the "Don't Ask, Don't Tell" statute, Jamie Gorelick, then general counsel for the Department of Defense, confirmed that a declarant who recanted might succeed in rebutting the presumption. She also noted that it was "hypothetically" possible for one to have a homosexual orientation with having a propensity to engage in homosexual acts, but she did not explain during those hearings how a service member could rebut the presumption short of retracting the original statement. When she was asked whether the statement "I am a homosexual but I have no intent or desire to engage in homosexual acts and I have never engaged in homosexual acts" would be enough to rebut the presumption, Ms. Gorelick answered:

> It is hypothetically possible that . . . a decision-making authority could take that assertion to be sufficient. For example, if that assertion is essentially, I was misunderstood, I did not mean it, it was a joke. I mean it could hypothetically suffice.
>
> In the real instance that I believe you are trying to get at, Senator, in which someone made the statement knowingly and was not drunk or had not lost his or her mind, it seems to me it is very very unlikely that the mere assertion that I am not engaged in acts, I 'do not have such a propensity or intent, would be sufficient to carry that burden . . . which . . . is a very high burden. . . .

*Policy Concerning Homosexuality in the Armed Forces: Hearings before the Senate Committee on Armed Services,* 103d Cong., 2d Sess. 772 (1993).

7. Under the "Don't Ask, Don't Tell" plan, then homosexual males and females are allowed to serve in the military provided they "don't tell", that is provided they do not state that they are

## B. Conduct or Speech: The Regulation

■ Considered in isolation, then, the statute on its face imposes a restriction on speech. But this does not end the matter for the statute should not be read apart from the Department of Defense's implementing regulations, as Congress explicitly provided that the "Don't Ask, Don't Tell" plan embodied in § 654 was to be implemented "under regulations prescribed by the Secretary of Defense," 10 U.S.C. § 654(b), which are contained in Department of Defense Directive 1332.30. *See Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer."). Thorne's facial attack on the plan, then, must encompass both the statute and the implementing Directives. When the statute is considered together with this Directive, the statutory tautology disappears because the Directive defines "propensity" differently from the dictionary definitions cited here. According to the Directive, a "[p]ropensity to engage in homosexual acts means more than an abstract preference or desire to engage in homosexual acts; it indicates a *likelihood* that a person engages in or will engage in homosexual acts." Dir. 1332.30 at 1–1 (emphasis added). And the Directive goes on to define a "statement that a member is a homosexual or bisexual or words to that effect" as "[l]anguage or behavior that a reasonable person would believe was intended to convey that statement that a person engages in, attempts to engage in, or has a propensity to engage in homosexual acts." Dir. 1332.30 at 2–1. These regulatory definitions make clear that a service member triggers the presumption by making a statement that a reasonable person would believe was intended to convey the statement that the member had a propensity to engage in homosexual acts. Also clear from the Directive's definitions is that the member can then rebut that presumption, without recanting the original state-

ment, by convincing the factfinder that although he has a homosexual orientation, he is not *likely* to engage in homosexual acts. Because the directive makes a meaningful distinction between an unrecanted statement of homosexual orientation, on the one hand, and a propensity to engage in homosexual acts, on the other, the possibility of rebutting the presumption is, on the face of the directive, no longer illusory. Theoretically, then, a service member could trigger the presumption by stating that he was gay, but then rebut the presumption by showing that he was not likely to engage in homosexual acts. Thus, the entire "Don't Ask, Don't Tell" plan, including the implementing Directive, appears on its face to provide service members with an opportunity to rebut the presumption without having to recant the triggering statement of homosexuality. From this, it follows that the plan is aimed at conduct and is not a speech restriction.

This conclusion does not end the inquiry, for Thorne contends that the manner in which the plan, including the Directive, operates in practice allows no rebuttal of the presumption short of recantation. More specifically, his contention is that although the Directive creates a theoretical possibility of rebutting the presumption without recanting the statement that triggered the presumption, the DOD has applied the Directive in a manner that makes the presumption irrebuttable in practice. Assessing this aspect of Thorne's challenge requires a factual inquiry into the manner in which § 654 and Directive 1332.20 have been implemented in practice.

■ Unfortunately, the current record is too sparse to permit a confident conclusion on this issue. For its part, the government offered the affidavit of Navy Commander Robert P. Monahan, who is the Assistant Division Director of the General Litigation Division in the Navy's Office of the Judge Advocate General. Monahan states that as of May 15, 1994, discharge proceedings had been instituted against eleven service mem-

---

gay. Under the previous plan, homosexuals could not serve; they were barred on the basis of their status, not their speech. Thus, the cases upholding the previous policy against First Amendment challenges are inapposite here. *See,*

*e.g., Steffan v. Perry,* 41 F.3d 677 (D.C.Cir.1994); *Pruitt v. Cheney,* 963 F.2d 1160 (9th Cir.1991); *Ben–Shalom v. Marsh,* 881 F.2d 454 (7th Cir. 1989), *cert. denied,* 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990).

bers because they had stated they were homosexual or bisexual, and that five of the members had rebutted the presumption. But he does not go on to describe the facts of those cases, so it is impossible to know whether the members rebutted the presumption by recanting their original statements or in some other manner. At the hearing on this matter, counsel for the government admitted she was not familiar with the facts of the five cases, but thought that in one or two of the cases the member rebutted the presumption by testifying "that he was confused about his sexuality and had perhaps decided that he was not inclined or likely to engage in any homosexual conduct because he wasn't really sure what his preference was." Statements of this sort, of course, are essentially recantations.

Although government counsel was unsure about the facts of these cases, a newspaper report reflects that one service member who stated that she was a lesbian was retained even though she did not recant her statement. It appears she was found to have rebutted the presumption merely by testifying that she had not engaged in homosexual activity in the service in the past and would not do so in the future. *See* Reynolds Holding, *Navy Quits Trying to Boot Lesbian Officer*, S.F. Chron., June 16, 1995, at A16. This result seems contrary to the intention of the drafters of the "Don't Ask, Don't Tell" plan as that intention is reflected in the committee hearings. *Policy Concerning Homosexuality in the Armed Forces: Hearings before the Senate Committee on Armed Services*, 103d Cong., 2d Sess. 772 (1993); *Assessment of the Plan to Lift the Ban on Homosexuals in the Military: Hearings on H.A.S.C. No. 103–19 Before the Military Forces and Personnel Subcommittee of the House Committee on Armed Services*, 103d Cong., 1st Sess. 200 (1993). Nonetheless, the case, if true, supports the notion that the presumption, as a matter of practice, can be rebutted. If the DOD in fact applies the plan in a manner consistent with the definitions in the Directives, then the plan would not implicate the First Amendment, for it would amount to a government regulation aimed at a service member's conduct. The service member's speech would merely serve

as the trigger for the process. *See Wayte v. United States*, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (court upheld against First Amendment challenge a government policy whereby person's statement of intent not to register with the Selective Service System triggered an investigation and possible prosecution).

Yet, whether the DOD in fact administers the plan in a manner that allows the presumption to be rebutted short of a recantation is in doubt in light of a memorandum issued by Judith Miller, general counsel for the DOD, after the decision to retain the lesbian Navy officer. *See* Rowan Scarborough, *Pentagon Memo Removes Winning Defense for Gays*, Wash. Times, December 29, 1995, at A3. In that memorandum, Ms. Miller indicated that a service member's argument that her statement of homosexuality was merely a statement of orientation and not of conduct should not be interpreted by administrative boards as a successful defense. If this memorandum accurately reflects the current DOD enforcement policy, then it may well be that nothing short of a recantation of the original statement would cause an administrative board to find that the presumption had been rebutted. In that case, the "Don't Ask, Don't Tell" plan would amount to the rule that if a service member says he is gay, he will be discharged, unless he convinces the board that he is not gay. Because a service member's retention in the services would turn on whether or not he *states* that he is gay, the plan would amount to a restriction on that member's speech, rather than a regulation of his conduct.

In sum, the current record precludes a confident conclusion concerning whether the "Don't Ask, Don't Tell" plan, as enforced, affords openly gay service members with a meaningful opportunity for rebuttal of a presumption created by speech. Accordingly, by order entered contemporaneously with this Memorandum Opinion, the Court directs the parties to supplement the record with facts to enable the Court to determine the extent to which the presumption is rebuttable in practice without a recantation.

In any event, it is useful at this point to consider whether the constitutionality of the "Don't Ask, Don't Tell" plan actually turns on the manner in which the plan is applied. The government contends that it does not, because even if the plan amounts to a restriction on speech rather than on conduct, it passes First Amendment muster. Assuming *arguendo,* that the plan amounts to a speech restriction, the analysis of the plan's constitutionality proceeds in three steps. First, it must be determined whether the restriction is content-based or content-neutral, as this controls the appropriate level of judicial scrutiny. Next, because this is a novel context, the appropriate level of scrutiny must be identified. Finally, the plan must be examined using the appropriate level of scrutiny to ascertain whether it passes muster.

## C. Content–Based or Content–Neutral

Assuming, *arguendo,* that the "Don't Ask, Don't Tell" plan is a speech restriction, the next question is whether the regulation is content-based or content-neutral. The question is significant because if the restriction is content-neutral, it will be subjected to a significantly lower degree of judicial scrutiny than if it is a content-based restriction.

 In general, "laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based." *Turner Broadcasting System, Inc. v. F.C.C.,* —— U.S. ——, ——, 114 S.Ct. 2445, 2459, 129 L.Ed.2d 497 (1994). The "Don't Ask, Don't Tell" plan is plainly a content-based restriction because it identifies the speech that triggers the presumption on the basis of the content of that speech. Service members who say, "I am a heterosexual" or who say nothing at all are not subject to dismissal, but those who say "I am a homosexual" are subject to dismissal. *See, e.g., Boos v. Barry,* 485 U.S. 312, 318–19, 108 S.Ct. 1157, 1162–63, 99 L.Ed.2d 333 (1988) (plurality opinion) (holding municipal ordinance that determines whether picketing in front of foreign embassies is permitted on the basis of whether the picket signs are critical of the foreign government to be content based).

 The government, citing *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), contends that the plan is nonetheless a content-neutral restriction because it is aimed not at the speech itself, but at the "secondary effects" of the speech. In *Renton,* a city ordinance prohibited adult movie theatres from locating within 1000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school. Although the ordinance placed no restrictions on the location of theatres showing other types of movies, the Supreme Court held that the restriction was properly analyzed as a content-neutral time, place, and manner regulation because it was aimed not at the content of the films shown "but rather at the *secondary effects* of such theaters on the surrounding community." *Id.* at 47, 106 S.Ct. at 928. The ordinance was purportedly designed to "prevent crime, protect the city's retail trade, maintain property values, and generally protect and preserve the quality of life" in the city, and was therefore "*justified* without reference to the content of the regulated speech." *Id.* at 48, 106 S.Ct. at 929 (quoting *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976) (emphasis added)). Similarly, argues the government here, the "Don't Ask, Don't Tell" plan is justified on the basis of the disruptive effect associated with a service member's statement that he is a homosexual, such as impairment of unit cohesion and military preparedness. This argument is unpersuasive; it stretches the "secondary effects doctrine" too far. The Supreme Court has made clear that "[l]isteners' reactions to speech are not the type of 'secondary effects' ... referred to in *Renton.* ... The emotive impact of speech on its audience is not a 'secondary effect.'" *Boos,* 485 U.S. at 321, 108 S.Ct. at 1164 (refusing to apply *Renton* to ordinance making it unlawful to carry outside a foreign embassy a picket sign displaying a message critical of that foreign government); *see also R.A.V. v. City of St. Paul,* 505 U.S. 377, 394, 112 S.Ct. 2538, 2549, 120 L.Ed.2d 305 (1992) (refusing to apply *Renton* to statute that prohibited the display of a symbol which one knows to arouse anger, alarm, or resentment in others

on the basis of race, color, creed, religion, or gender). Similarly, the government here cannot defend the "Don't Ask, Don't Tell" statutory plan by asserting that it is aimed not at the statement "I am gay," but at the psychological impact that statement has on those who hear it. *See Boos*, 485 U.S. at 321, 108 S.Ct. at 1164 ("[I]f the ordinance [in *Renton* ] was justified by the city's desire to prevent the psychological damage it felt was associated with viewing adult movies, then analysis of the measure as a content-based statute would have been appropriate.").

## D. Appropriate Level of First Amendment Scrutiny

 The next step in the analysis is to identify what level of judicial scrutiny the statute and regulation must survive in order to pass constitutional muster. Ordinarily, content-based speech restrictions are subject to "strict scrutiny," surviving only if the government "show[s] that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Simon & Schuster, Inc. v. Members of New York State Crime Victims Board*, 502 U.S. 105, 118, 112 S.Ct. 501, 509, 116 L.Ed.2d 476 (1991) (quoting *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231, 107 S.Ct. 1722, 1728, 95 L.Ed.2d 209 (1987)). Such restrictions are subjected to this most exacting scrutiny because they "rais[e] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster*, 502 U.S. at 116, 112 S.Ct. at 508. And this is of constitutional significance because "[t]he First Amendment reflects a 'profound national commitment' to

the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'" *Boos v. Barry*, 485 U.S. 312, 318, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 (1988) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964) (citations omitted)). But this rationale does not apply with equal force in the military context, for the "military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps." *Goldman*, 475 U.S. at 507, 106 S.Ct. at 1313. Thus, it is well settled that judicial review "of military regulations challenged on First Amendment ground is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman v. Weinberger*, 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986).[8]

 While it is clear that the traditional strict scrutiny standard is inappropriate in this context, it is unclear exactly what standard should apply. No case has explicitly defined the appropriate level of scrutiny to be applied to a content-based restriction on speech in the military context. The parties commend to the Court standards divined from the Supreme Court's holdings in *Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) and *Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980). Those cases are inapposite, however, because each involved military regulations that were content-neutral.[9] Nor

---

8. It is worth making clear that the deference in the particular circumstances of this case is to the judgment of the DOD concerning military matters, including what factors affect military readiness and effectiveness. Yet, in the case of the "Don't Ask, Don't Tell" plan, it may be plausibly argued that the plan was not solely the product of DOD's military judgment, which surely warrants deference, but is instead the product of a political compromise made with one eye on DOD's military judgment and the other on the next election, a circumstance arguably entitled to less, if any, judicial deference. But this notion, while plausible, is too speculative to serve as a basis for a judgment about the proper degree of judicial deference and has played no role in this decision.

9. In *Glines*, the Supreme Court upheld on a First Amendment challenge Air Force regulations requiring service members to obtain prior approval from the base commander before circulating petitions on base. The Supreme Court held that the regulation passed constitutional muster because it "restrict[ed] speech no more than [was] reasonably necessary to protect the substantial governmental interest." 444 U.S. at 355, 100 S.Ct. at 599. In *Goldman*, the Court considered the constitutionality of an Air Force regulation restricting the wearing of non-military headgear. The regulation was challenged by an officer who wished to wear a yarmulke, non-military headgear prohibited by the regulation. The Supreme Court upheld the regulation, stating that the restriction "reasonably and evenhandedly regu-

does it appear appropriate to adopt the First Amendment "intermediate scrutiny" test, which applies to time, place, and manner restrictions, a category of restrictions into which the "Don't Ask, Don't Tell" plan does not fall.[10] And it also seems inappropriate to attempt to apply some level in between, for unlike the traditional three levels of scrutiny in the equal protection context, the tests of strict scrutiny and intermediate scrutiny in the First Amendment context do not represent points along a continuum of judicial review. Rather, the two standards are more different in quality than in degree, reflecting the fact that they apply to two different types of speech restrictions. The strict scrutiny test is applied to restrictions in which the government discriminates on the basis of the content of speech, whereas the intermediate scrutiny test is applied to content-neutral time, place, and manner restrictions. In other words, the intermediate scrutiny standard, unlike its equal protection counterpart, does not represent a more deferential version of the strict scrutiny standard, but is instead a standard fashioned to fit the task of reviewing restrictions different in nature from the restrictions the plan embodies. By contrast, the strict scrutiny standard is fit for reviewing the category of restriction into which the plan falls, but it is not tailored to do so because it takes no account of the plan's military context and the judicial deference this entails. From this, it follows, sensibly, if not inevitably, that the appropriate level of scrutiny should be a moderated version of strict scrutiny.

 Strict scrutiny requires a reviewing court to inquire into whether the speech restriction is "necessary to serve a compelling state interest." *Simon & Schuster*, 502 U.S. at 118, 112 S.Ct. at 509. Moderating that standard somewhat to allow for deference to the military would indicate that instead of being "necessary" to the achieve-

ment of government objectives the "Don't Ask, Don't Tell" plan need only "substantially further" those goals. And rather than the governmental interest being "compelling," they need only be "important." This yields the result that a content-based regulation in the military context must substantially further an important governmental interest in order to pass First Amendment muster. Notably, this standard is quite similar to the intermediate scrutiny standard in the equal protection context. *See, e.g., Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 1914 ("substantially related to an important governmental objective"); *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (same). Such a resemblance is to be expected, for in the equal protection context, the intermediate scrutiny standard was intended to be a standard of review similar in quality, but more deferential in degree than the traditional strict scrutiny standard applicable to suspect classifications.

### E. Application of Heightened Scrutiny

 It remains to determine whether the "Don't Ask, Don't Tell" plan survives this moderated heightened scrutiny. The proffered governmental interest for the plan is to maintain military readiness by preserving "unit cohesion." Specifically, the government identifies three aspects of that goal: (i) preserving privacy among service members, (ii) minimizing sexual tension, and (iii) preventing unit polarization. There can be little dispute that these interests are "important," and Thorne concedes as much. The more difficult question is whether the "Don't Ask, Don't Tell" plan "substantially furthers" those interests. For this task, it is necessary to examine the plan in the light of each of the three specific interests identified by the government.

---

late[d] dress in the interest of the military's perceived need for uniformity." 475 U.S. at 510, 106 S.Ct. at 1314.

**10.** Under this standard, time, place, and manner restrictions on speech survive First Amendment scrutiny provided they "are justified without reference to the content of speech, that they are narrowly tailored to serve a significant govern-

mental interest, and that they leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)).

■ First, does the "Don't Ask, Don't Tell" plan substantially further the goal of protecting the privacy of service members? The government's position is that it invades the privacy of service members to require them to live, sleep, and shower with those who may find them sexually attractive. While this may be true, the particular statute that Congress chose to enact nonetheless does not substantially further the goal of privacy, for it does not in fact protect the privacy of heterosexuals by keeping "their naked bodies safe in the showers from the stares of homosexuals." *Able v. United States,* 880 F.Supp. 968, 978 (E.D.N.Y.1995). Gays are allowed to serve.[11] Gays are allowed to shower with heterosexuals. A heterosexual *knows* that homosexuals are serving—and showering—in the military. Indeed, heterosexuals do not even have the dubious benefit of being oblivious as to whether their shower mates are homosexual, because the Directive explicitly states that the "rebuttable" presumption is not triggered by "associational activity such as going to a gay bar, possessing or reading homosexual publications, associating with known homosexuals, or marching in a gay rights rally in civilian clothes." DOD Directive 1332.30 at 8–1; *see also* S.Rep. No. 112, 103d Cong., 1st Sess. 292 (1993). Thus, for example, a heterosexual service member may be required to share bath facilities with a member of the same gender who has been seen marching in a gay rights parade in civilian attire.

The government does not adequately answer this point, relying instead on the congressional testimony of distinguished witnesses to the effect that privacy is threatened by homosexuals serving in the military. But these statements, while they might support an outright ban on gays in the military, do not explain how the privacy of heterosexual soldiers is promoted by a statutory and regulatory plan that simply requires a gay soldier to refrain from speaking the words "I am gay." For example, General Colin Powell was quoted in a Senate Report as stating:

> [I]t is very difficult in the military setting, where you don't get a choice of association, where you don't get a choice of where you live, to introduce a group of individuals who are proud, brave, loyal good Americans, but who favor a homosexual lifestyle, and put them in with heterosexuals who would prefer not to have someone of the same sex find them sexually attractive, put them in close proximity, [and] ask them to share the most private facilities together, the bedroom, the barracks, the latrines, and showers.

S.Rep. No. 112, 103d Cong., 1st Sess. 283 (1993). Accordingly, the Senate Committee concluded that in "civilian life people are not compelled to live with individuals who are sexually attracted to persons of the same sex, and the committee finds no military necessity to compel persons to do so in the military." *Id.* at 281. This, of course, is exactly what the current statute and regulations *do* compel. A plan that *allows* gays to serve in the military—as this one does—contemplates that gays in fact *will* serve. These comments, and others like them in the legislative history, simply do not explain how or in what way the privacy interests of service members are furthered by the practice of discharging vocal homosexuals while allowing known, yet silent homosexuals to serve.

■ Second, does the "Don't Ask, Don't Tell" plan substantially further the goal of minimizing sexual tension? The government contends that sexual tension is destructive in the military context because it is distracting. No one can plausibly disagree with this proposition. Indeed, it is for this reason, in part, that the military provides separate barracks for men and women. The government points to testimony that:

> With openly gay and heterosexual personnel together, sexual tension would fester 24 hours a day in deployed military units

---

**11.** History confirms that homosexuals have served as ably, as effectively, and with the same measure of devotion to duty and heroism as have heterosexuals and hence that a person's merit as a soldier, sailor, airman, or marine is independent of the person's sexual orientation. In any event, no opinion is expressed here on whether a person's sexual preference or orientation, by itself and in the absence of proscribed conduct, could constitutionally serve as a basis for exclusion or separation from the military.

and ships. Romantic interests, even if unconsummated, would shatter the bonds that add up to unit cohesion.

Bernard E. Trainor & Eric L. Chase, *Keep Gays Out*, N.Y. Times, March 29, 1993, at A15, *quoted in, Policy Concerning Homosexuality in the Armed Forces: Hearings before the Senate Committee on Armed Services*, 103d Cong., 2d Sess., 307 (1993) (statement of Sen. Warner). But even granting that sexual tension is destructive of unit cohesiveness, it is hard to see how the "Don't Ask, Don't Tell" plan furthers minimizing sexual tension in the military. The government has not explained how the exclusion of a service member who says "I am gay" while tolerating silent homosexuals serves to reduce or minimize sexual tension in the ranks. Indeed, it may plausibly be argued, that the opposite is true. By the government's own logic, the silent gay will experience some degree of sexual tension, unconsummated though it might be. Indeed, when one considers that soldiers are permitted to march in gays rights parades and engage in other activity that indicates a likelihood that one is gay without triggering the presumption, it is difficult to see how sexual tension is reduced by banning speech that amounts to the three words "I am gay."

■ Finally, does the "Don't Ask, Don't Tell" plan substantially further the goal of preventing unit polarization? The government argues that when an openly gay soldier is allowed to serve, that soldier's unit polarizes, with those who oppose gays serving in the military on one side, and those who support their service on the other. Such polarization, argues the government, threatens military effectiveness. No doubt polarization of any sort [12] hampers a unit's cohesiveness and

hence its military effectiveness. Yet, once again, the "Don't Ask, Don't Tell" plan fails substantially to further the goal of preventing such polarization. The Directive explicitly allows the service of a homosexual who does not disclose his sexual orientation, but who nonetheless reads gay literature, frequents gay bars, and marches in gay rights parades. It also allows the service of one who refuses to reveal his or her sexual orientation, but who nonetheless vociferously advocates for the right of gays to serve. Both of these persons would cause substantially the same degree of debate, unrest, and polarization as that caused by a person who actually stated he was gay. Discharging only those who make the statement, "I am gay" does not substantially further the prevention of unit polarization.

■ In sum, requiring that service members "Don't tell," while still permitting homosexuals to serve does not substantially further any of the proffered goals of the "Don't Ask, Don't Tell" plan. Accordingly, if the record, as supplemented by the parties, were to reflect that the "Don't Ask, Don't Tell" plan is implemented in practice in such a way as to make the presumption irrebuttable, then § 654(b)(2) and its accompanying regulations would constitute a content-based restriction on speech that fails heightened scrutiny and therefore violates the First Amendment.

An appropriate order will issue.

---

12. Worth noting is that polarization deleterious to a unit's effectiveness could also arise as a result of disagreement among service members over a wide range of issues, including politics, race, ethnicity, and religion. One wonders in this regard whether this polarization contention would be persuasive in support of a "Don't Ask, Don't Tell" plan for Jews or for Muslims. Sexual tension and religious tension are different in nature, but no fair observer of human history could conclude that religious fervor and religious antipathies are less deeply felt and less potentially incendiary than sexual ones. Even so, a "Don't Ask, Don't Tell" plan for religious affilia-

tions would never be proposed or tolerated and it would be instructive to understand why this is so. Perhaps an important reason is the quality of leadership in our society's many institutions. If the leaders of those institutions understood prejudice against homosexuals as a fiction born of ideology, then that view would eventually permeate society and eliminate any potential polarization stemming from the service of openly gay people in the military, just as leadership has helped, and continues to help, to ensure that attitudes among service members about religion and race tend to tolerance, not intolerance and hence to cooperative effort, not polarization.